STATE OF VERMONT
ENVIRONMENTAL COURT

|   |   |   |
|---|---|---|
| In re: Eastview at Middlebury, Inc. | } | |
| (Appeal of Act 250 Permit #9A0314) | } | Docket No. 256-11-06 Vtec |

## Decision on the Merits

Eastview at Middlebury, Inc. ("Eastview") seeks to develop a multi-level residential retirement community adjacent to the Porter Hospital on South Street in Middlebury (hereinafter referred to as the "Eastview Project"). On October 6, 2006, the District #9 Environmental Commission ("District Commission") issued Act 250 Permit #9A0314 for the Eastview Project, together with its Findings of Fact, Conclusions of Law and Order (hereinafter collectively referred to as the "District Commission Decision").

In its Decision, the District Commission announced its determination that the Eastview Project complied with all applicable Act 250 criteria (10 V.S.A. §§ 6086(a)(1)–(10)). Dr. Miriam Roemischer, a neighbor to the Eastview Project, filed a timely appeal under several Act 250 Criteria. Eastview, together with its Co-Applicants, filed a cross-appeal, seeking to challenge the District Commission determination concerning the amount of land to be covered by its Permit and whether Dr. Roemischer had standing to challenge the District Commission determination under 10 V.S.A. § 6086(a)(9)(B)(impact upon primary agricultural soils).

The Court conducted a site visit and trial over a series of five days, completing the taking of evidence on August 1, 2007. The parties were thereafter afforded an opportunity to file post trial memoranda and proposed findings of fact and conclusions of law, after which the Court began its research and deliberation on the issues preserved for review in these appeals.

Dr. Roemischer ("Appellant") has been represented in these proceedings by Stephanie Kaplan, Esq., with seasonal assistance from David Grayck, Esq. Eastview has been represented in these proceedings by Mark G. Hall, Esq. Other parties appearing in these proceedings are Porter Medical Center, Inc., represented by Keith A. Roberts, Esq.; The President and Fellows of Middlebury College, Inc. ("Middlebury College"),[1] represented by Austin D. Hart, Esq.; The

---

[1] Middlebury College and Porter Medical Center, Inc. are Co-Applicants with Eastview; their status as Co-Applicants is discussed in more detail in later sections of this Decision. Middlebury College also filed its own cross-appeal of the District Commission Decision.

Town of Middlebury ("Town"), represented by Karl W. Neuse, Esq.; and the Vermont Agency of Natural Resources, represented by Catherine Gjessing, Esq.[2]

## I.  Procedural History and Determinations.

The primary parties'[3] final post-trial filings included objections to each other's prior filings, both for reasons of timeliness and substance.  The Court has reviewed the filings by all parties and has afforded the appropriate weight to these post-trial legal arguments.  To the extent that Eastview's or Dr. Roemischer's filings were intended as motions to exclude, those motions are **DENIED**.

### A.  Party status challenge

In the Statement of Questions filed in connection with Eastview's cross-appeal, Eastview questioned whether Appellant Roemischer "ha[s] standing to oppose the [Eastview] Project under 10 V.S.A. § 6086(a)(9)(B)?"  The District Commission granted Appellant Roemischer preliminary party status to participate in its proceedings under Act 250 Criteria 1(A)(Air), 1(B), 5, 8, 9(A), 9(B), and 10.  District Commission Decision at 4–5.  At the close of evidence, Eastview offered no objection to the District Commission finalizing its party status determination regarding Dr. Roemischer.  Thereafter, the Commission granted Dr. Roemischer final party status. Id.

We have previously commented on the interaction of the procedural rules that govern this Court, including the Vermont Rules of Environmental Court Proceedings (V.R.E.C.P.), the Vermont Rules of Civil Procedure (V.R.C.P.), the Vermont Rules of Evidence (V.R.E.) and the Vermont Rules of Appellate Procedure (V.R.A.P.), as well as statutory provisions and rules that govern state land use proceedings before the various district environmental commissions.  See Route 103 Quarry, Docket No. 205-10-05 Vtec slip op. at 4 (Vt. Envtl. Ct. Nov. 22, 2006) (Supreme Court appeal pending, Docket No. 2006-546).  The starting point for any discussion of party status in Act 250 appeals is V.R.E.C.P. 5(d)(2), which provides that an appealing party who participated in the proceedings below is "automatically accorded [party] status when the[ir] notice of appeal is filed."  Thus, an appealing party who has a "particularized interest . . . that may be affected by an act or decision by a district commission" need not specifically request party status in appeals before this Court, even though such was the necessary practice in appeals

---

[2]  At the request of their respective clients, Attorneys Neuse and Gjessing did not play active roles in the court trial.

[3]  Eastview and Appellant Roemischer.

governed by former Vermont Environmental Board Rule 14. 10 V.S.A. § 6085(c)(1)(E). Once a party who participated below files their notice of appeal or enters their timely appearance in a pending Environmental Court appeal, that party is entitled to present evidence on all issues preserved for review in the pending appeal, unless and until this Court specifically dismisses that party on the Court's own motion or by motion of another party. See V.R.E.C.P. 5(d)(2).

Appellant Roemischer owns and resides in property across South Street Extension from the Eastview Project site and the agricultural lands it may impact. She was afforded party status under Criteria 9(B) by the District Commission. Dr. Roemischer's standing to challenge the District Commission determination under Criteria 9(B) flows from her proximity to the project site and the adjoining agricultural lands. See Re: Putney Paper Company, Inc., Declaratory Ruling Request #335, Findings of Fact, Conclusions of Law, and Order at 8-9 (Vt. Envtl. Bd. May 29, 1997) (for standing purposes, contrasting the impact on a potential party's own interests with broad, general effects). To the extent that Eastview's Question #4 in its Statement of Questions was intended as a request to have Appellant Roemischer's standing under Criteria 9(B) vacated, that request is **DENIED**.

### B. Criteria and issues preserved for review in this de novo appeal:

Act 250 appeals are heard de novo by this Court. 10 V.S.A. § 8504(h). But such a statement is often misleading, since most Act 250 appeals, such as here, include challenges to only a limited number of issues. A more precise explanation is that our de novo review is limited to the issues that have been preserved by the appellants in their respective statements of questions. See V.R.E.C.P. 5(f) and In re Garen, 174 Vt. 151, 156 (2002) (citing Village of Woodstock v. Bahramian, 160 Vt. 417 (1993)). We must also bear in mind that the burden of proof that Act 250 imposes on each party will determine how we view the evidence each party submits in regards to the Act 250 Criteria that have been properly preserved for our review in this appeal. We discuss these concepts below.

### 1. Scope of review.

In her Statement of Questions, Appellant initially sought this Court's review of seven Act 250 Criteria.[4] But prior to the start of trial, Dr. Roemischer withdrew her appeal under Act 250

---

[4] 10 V.S.A. §§ 6086(a)(1)–(10) list the ten major criteria of Act 250, but those provisions have many sub-criterion, raising the number of issues that could be addressed in an Act 250 proceeding to a total of thirty, particularly if one counts separately the issues of conformance with town and regional plans contained in 10 V.S.A. § 6086(a)(10).

3

Criteria 1 and 1(B). Thus, the issues Appellant has preserved for our review in this appeal are the following:

a. Criterion 5,[5] concerning the proposed Project's impact on traffic;

b. Criterion 8, concerning the proposed Project's impact on the aesthetics, scenic or natural beauty of the area;

c. Criterion 9(A), concerning the Project's impact upon area growth;

d. Criterion 9(B), concerning the Project's impact upon primary agricultural soils; and

e. Criterion 10, concerning the Project's conformance with the Town Plan.

Eastview filed a cross-appeal and submitted its own Statement of Questions, later amended with leave from this Court. In its Questions, Eastview also challenged two determinations of the District Commission: first, the project's impact upon primary agricultural soils under Criterion 9(B) and second, what lands would be encumbered by the District Commission Permit. Eastview's Co-Applicant, Middlebury College, filed its own cross-appeal and Statement of Questions, in which it joined Eastview in objecting to the District Commission determination that other College lands were encumbered by the Eastview Permit, beyond the immediate confines of the Project site.

As no other determinations by the District Commission were preserved for our review in this appeal, all other District Commission determinations remain valid and have become final for this application. Woodstock v. Bahramian, 160 Vt. at 424 (citing In re Torres, 154 Vt. 233, 236 (1990)).

**2. Burden of proof.**

As both Eastview and Appellant have suggested in their proposed Findings and Conclusions, Act 250 establishes a specific schedule of who carries the respective burdens of proof on each of the Act 250 criteria. 10 V.S.A. § 6088. A party's burden of proof can include two subsets: the burden of production and the burden of persuasion. The burden of production requires the obligated party to produce sufficient evidence for a district commission, or this Court on appeal, to make a factual determination; the burden of persuasion refers to the obligation of persuading the fact finder that certain facts are more likely true than not. See In re Denio, 158 Vt. 230, 237-39 (1992) (discussing and applying the burden of proof in the Act 250 context).

---

[5] Each Act 250 Criterion referenced here is to the specific subsection of 10 V.S.A. § 6086(a).

Previous decisions of the Environmental Board suggest that 10 V.S.A. § 6088 speaks solely to the burden of persuasion and that an applicant always carries the initial burden of producing some evidence that would allow for positive findings upon each of the applicable Act 250 Criteria. See Re: John J. Flynn Estate and Keystone Development Corp., Docket No. 4C0790-2-EB, Findings of Fact, Conclusions of Law and Order slip op. at 17, n. 4 (Vt. Envtl. Bd. May 4, 2004) (citing Re: Killington, Ltd. and International Paper Realty Corp., Docket No. 1R0584-EB-1, Findings of Fact and Conclusions of Law and Order slip op. at 21 (Vt. Envtl. Bd. Sept. 21, 1990).[6] We agree that an applicant always carries the initial burden of production. Pursuant to the statutory directive of 10 V.S.A. § 6088, we note that Appellant here carries the burden of persuasion on Criteria 5 and 8; Eastview and its Co-Applicants must fulfill the burden of persuasion on the remaining Criteria in this appeal (i.e., 9(A), 9(B) and 10).

In light of the evidence admitted at trial, including that evidence put into context by the site visit the Court conducted with the parties prior to trial, and after determining the credibility and weight that should be afforded to that evidence, we now announce our factual determinations and legal conclusions under the Act 250 Criteria preserved for our review in this proceeding.

## II. Findings and Conclusions on Act 250 Criteria preserved for our review.

### General Findings:[7]

1. The Eastview project is proposed for a forty-acre portion of land, adjacent to the parcel upon which the Porter Hospital and the Porter Nursing Home are located. The existing and proposed developments have frontage on two Town maintained roads, known as South Street and South Street Extension.

2. Porter Hospital and Porter Nursing Home are owned and operated by Porter Medical Center, Inc. (Porter Medical); the Porter facilities occupy their land pursuant to a long-term lease between Porter Medical and the fee owner of the property, Middlebury College.

---

[6] Pursuant to 10 V.S.A. § 8504(m), decisions of the former Environmental Board are to be given the same precedential weight and consideration as those of the Environmental Court.

[7] All factual determinations recited here are derived from evidence presented at trial, although many facts, particularly those recited in this General Findings section, were not particularly disputed and may not have been the subject of the legal issues preserved for review in this appeal. Some facts, particularly those related to the operation of Porter Hospital, may not have been important to our legal determinations here; they are provided here to provide background and context for the Court and its determinations.

3.　　　Middlebury College holds title to many parcels of land in the Town and across Addison County. Much of this land was given or bequeathed to the College, including by families such as the Porter family, for whom the Porter Medical facilities are named.

4.　　　Middlebury College uses some of its land to support its undergraduate educational programs and support services for its students, staff and faculty. In the past, it has often declined to enter into agreements to sell fee simple title to its properties outright, preferring instead to retain a remainder interest in its lands, for possible future use or support of its educational pursuits.

5.　　　The College has underwritten and subsidized the operation of Porter Hospital for several years; the Hospital has not been able to generate sufficient income from its operations to fully defray its operational costs.

6.　　　When presented with the proposed Eastview Project, the College chose not to sell the necessary lands to the Project proponents, but rather to lease the land on a long-term basis, much like the lease agreement concerning the lands occupied by the Porter Medical facilities. The lease option for the Eastview lands evolved into a multi-staged lease, whereby the lands necessary for the Eastview Project would be leased by Middlebury College to Porter Medical, which would in turn lease these lands to Eastview. The sub-lease to Eastview would provide an income component that would benefit Porter Medical and assist in defraying its operational costs.

7.　　　Eastview presented into evidence a draft sub-lease between it and Porter Medical (Exhibit 11), but conceded at trial that it was only a draft and its terms could be revised, pending the outcome of its permit proceedings. The lease between Porter Medical, as lessee, and Middlebury College, as lessor, had not been finalized as of trial.

8.　　　The sub-lease to Eastview, titled "Ground Sublease," would extend over a period of ninety-nine years, and provides for Eastview's exclusive use and possession of the property. Under the Ground Sublease, Eastview assumes the sole responsibility for the permitting, costs of development, taxes, insurance, right to sub-lease and other rights and responsibilities over the forty-acre parcel incident to the ownership or long-term leasing of real property. Absent Eastview's default under the terms of the Ground Sublease, particularly the financial terms, neither Porter nor Middlebury College retained a right to possess or control activities on the leased lands.

6

9.     The forty acres Eastview proposes to develop are directly adjacent to the Porter Medical facilities; the forty-acre parcel lies directly south of the Porter facilities, along the eastern edge of South Street Extension. Where the pavement ends on South Street, just past the southerly edge of the Porter Medical facilities, the road changes to South Street Extension.

10.     From its northerly intersection with Main Street in the center of Town and the Middlebury College campus, South Street represents an eclectic collection of residences, College athletic facilities and the community service facilities of Porter Hospital and Porter Nursing Home.

11.     The southerly boundary of the Porter lands adjoins a hedgerow which serves as a natural transition to the agricultural lands to the south. Just past the hedgerow are the lands that are proposed to be leased to Eastview.

12.     South Street Extension continues after the Porter lands as a dirt road; it travels in a general southerly direction for about 2 ½ miles, to its intersection with Morse Road, near Piper Crossing. All along South Street Extension, the scenery and views, particularly of the Green Mountain range to the east, are majestic. At the Eastview site, and to the south, a traveler along South Street Extension has a panoramic view of the well-maintained fields, some currently mowed or used for agricultural purposes in the foreground, with the Green Mountains in the background.

13.     The fields that comprise the Eastview site and lands to the south are owned by Middlebury College; the parcel on which the Eastview Project is proposed currently consists of 384± acres. The lands further south of this Middlebury College parcel also contain agricultural fields with majestic views.

14.     South Street and its Extension transition through three zoning districts: the High Density Residential District to its north; the Institutional District and the Agricultural/Rural Residential District to its south.

15.     Appellant owns and occupies a single family home on the west side of South Street Extension, just south of the Porter Medical facilities. Her home is within a cluster of several residential properties along the west side of South Street Extension; it is located directly across from the northerly edge of the proposed Eastview site.

16.     The parcel Eastview proposes to lease will have about 750 feet of frontage along South Street Extension. The paved portion of the road abuts the northerly portion of the proposed

7

leased land; the pavement ends just past the house that is to the south of Dr. Roemischer's property. The main entrance for the Eastview Project is on the dirt portion of the Street. The southerly boundary of the leased lands is just over 400 feet south of the Project entrance. South Street Extension continues from Eastview's southerly boundary line for about two miles.

17. Much of the forty acres proposed for the Eastview development consists of open fields, none of which has recently been used for agricultural purposes, but all of which have been mowed and well maintained. This portion of the College lands also contains the hedgerow, mentioned above, and an outcropping of trees in the middle of the project site, which appears to be an overgrown area where those who long ago worked this field collected rocks and other debris.

18. The views enjoyed by residents and travelers along South Street Extension are also enjoyed by the patients and guests at the Porter Medical facilities.

19. The Eastview Project is proposed to offer multiple levels of care and independent living to its residents. The main building in the Project is referred to as an Inn; it will be located immediately adjacent to the Porter Nursing Home, somewhat set back from the road and accessed by a common drive from South Street Extension. The Inn will include common dining and recreation facilities, 18 assisted living units, 16 sanctuary residential units for residents with memory loss, and 37 independent living apartments, 17 of which will be single occupancy and 20 of which will be double occupancy.

20. The Project will also include 30 detached single-story cottages, which will each serve as single family residences. The cottages will be accessed by the same drive that serves the Inn, along private interior roads. The cottages are clustered around the Inn to its south and east. No cottage will have direct, individual access from the road.

21. The cottages will be individually owned by or on behalf of their occupants. The underlying land will continue to be held by Eastview, under the long-term Ground Sublease.

22. Eastview proposes to construct, at its own expense, extensions of the municipal water and sewer mains and related infrastructure to serve the Inn and cottages, as well as certain off-site improvements for the calming of traffic along South Street.

23. The existing water and sewer mains currently extend along South Street, serving the individual residences and the Porter Medical facilities. These water and sewer mains currently end on the lands occupied by the Porter Medical facilities, adjacent to the Eastview Project site.

We now turn to the specific factual determinations and legal conclusions under each of the appealed Criteria.

**A.  Will the Eastview Project cause unreasonable congestion or unsafe conditions on area highways?**

24.     The Town of Middlebury has been developed in a "wheel-like" fashion in which all major roads lead to the center of town.  South Street is one of the "spokes" in this design; it serves as access to the many residences, College athletic fields, and institutional structures that adjoin it as it runs in a generally straight,[8] southerly direction, to the neighboring Town of Cornwall.

25.     South Street experiences the expected amount of vehicle and foot traffic for a road that is lined with many homes, athletic fields, a hospital and a nursing home.  The evidence presented at trial did not reflect undue traffic congestion or accidents in the vicinity of the Project site.

26.     Where the road transitions from pavement to dirt, and from South Street to South Street Extension, the use of the road changes from merely serving as access to the Town Village center to a natural, rural area used by many walkers, bicyclists and travelers in search of beautiful views of the Vermont countryside.

27.     The Vermont Agency of Transportation ("VTrans") has established a method of measuring the quality of roads and intersections, with a Level A level of service ("LOS") rating representing minimal delays and little or no accident experiences.

28.     Based upon all traffic expert testimony presented at trial, we reach the following conclusions regarding area traffic and the impacts upon it by the Eastview Project:

> a.  The intersection where the Porter Medical facilities access South Street and the intersection where the proposed Eastview Project will access South Street Extension current have a VTrans LOS rating of A.
>
> b.  The Eastview Project will generate an estimated thirty-three additional one-way vehicle trips during the peak hour[9] of traffic along South Street.  The traffic that the Eastview Project is estimated to generate will include vehicle trips by its administration,

---

[8]  About a mile south of the Eastview site, South Street Extension takes a turn to the east and then returns to its southerly direction.

[9]  In traffic analysis parlance, peak hour of traffic represents the hour when traffic is estimated to be the busiest.  The estimated peak hour of traffic is often used in traffic planning, to denote an estimated worst-case scenario for a project's impact upon area traffic.

9

staff, other employees, some of its owners and residents,[10] vendors and other business invitees.

c. All interior Eastview roads have been designed and will be constructed in accordance to Town and State road specifications. The interior roads include many gentle curves, so as to discourage speeding; they are aligned close to the clustered cottages so as to encourage occupants to walk to and from the cottages and the Inn. Walking paths are integrated into the road design plans.

d. Municipal and emergency service providers have reviewed and approved the Eastview road and walkway layouts.

e. Stopping and sight distances from the intersection of the Eastview drive and South Street Extension exceed the minimum distances established by VTrans.

f. The Eastview Project includes three internal parking areas which will provide adequate parking for the proposed Project and the visitor traffic it will generate.

29. The northerly end of South Street intersects with Main Street, a/k/a Vermont Route 30. The Eastview Project will generate a minimal increase in the traffic at this intersection.

30. Despite the relatively high LOS ratings for the traffic intersections along South Street and the minimal additional traffic the Eastview Project is estimated to generate for that Street and its intersections, Eastview had offered to implement and finance certain traffic calming and improvement measures along South Street, all of which are detailed in the plans offered into evidence in support of Eastview's application and to which the Town has assented. These measures include improvements to walkways and sidewalks and "bump-outs" along the roadway, which serve to narrow the roadway in certain areas so as to encourage traffic to slow down. The "bump-outs" can also serve to provide small additional patches of green space along the roadway and make it safer for vehicles to park along the roadway.

**Conclusions as to Criterion 5.**

We are directed by 10 V.S.A. § 6086(a)(5) to determine whether the Eastview Project, as proposed, will "cause unreasonable congestion or unsafe conditions with respect to the use of the highways, waterways, railways, airports and airways, and other means of transportation existing or proposed." We limit our analysis to Eastview's impact on Town roadways and walkways, since those are the only transportation resources referenced in the evidence presented by any party at trial.

---

[10] Some of Eastview's owners and residents are not expected to drive vehicles or travel often in vehicles off of the Eastview Project.

Our analysis is limited here because all credible evidence leads to a conclusion that Eastview will have a minimal impact upon area transportation routes and, when viewed in connection with the traffic calming measures proposed by Eastview along South Street, it appears that the project will have a net positive impact on the area roadways and walkways.

The Co-Applicants' traffic expert provided a convincing report on Eastview's estimated traffic impacts. There was no evidence offered to support a conclusion that the Eastview Project will negatively impact the VTrans LOS rating for any intersections along South Street or its Extension. This traffic report reveals that the additional traffic estimated to be generated by the Eastview Project will be a small fraction of the already existing traffic along those roads. The traffic calming measures Eastview has volunteered to implement will more likely improve vehicular and pedestrian traffic safety along area roads and walkways.

Most of the evidence presented by Appellant in opposition to a positive finding under Criterion 5 was anecdotal in nature, and more often referred to possible disturbances to the tranquility that walkers, joggers and bicyclists now enjoy as they walk past the Eastview Project site and further south along South Street Extension. Such concerns are more appropriately considered under Criterion 8; which we address below. To the extent that such visitors to South Street Extension will be disturbed by Eastview traffic, we do not find that the disturbances will likely cause the "unreasonable congestion or unsafe conditions" prohibited by 10 V.S.A. § 6086(a)(5). We reach this conclusion due to several factual conclusions, including that much of the traffic generated by the Eastview Project will be traveling <u>north</u> on South Street, away from the portion of South Street Extension so enjoyed by its visitors.

We therefore conclude that the Eastview Project, as proposed, conforms to Criterion 5.

**B.  Will the Eastview Project have an undue adverse impact upon area aesthetics?**

31.    Eastview and its planners recognized that they were planning this project for an area enjoyed and loved by many residents and visitors. It is apparent that their plans, and the various revisions to those plans, sought to blend the Project into its surroundings and minimize its adverse impacts upon the scenic natural beauty of the site and the area to its south.

32.    The Eastview site is about one mile from the Town village center; the Project will be adjacent to the institutional facilities of Porter Medical.

33.     With recent amendments to the zoning regulations and the Town Plan,[11] the Project site and the Porter Medical facilities are located in the Institutional Zoning District. The lands lying to the south of the project site are located in the Agricultural/Rural Residential Zoning District.

34.     Porter Hospital has evolved in purpose and physical plant much like many other Vermont hospitals. Its original, 2–3 story red brick structure has seen several additions and renovations. Several other one- and two-story structures now serve the Porter Medical patients, visitors and staff.

35.     Many area residents value their proximity to the institutional medical facilities at Porter; the Court's recollection is that even Appellant attested to this fact. Porter Nursing Home is an extension of the medical services provided at Porter Hospital; the proximity of Porter Hospital to the Nursing Home and area residents is a beneficial characteristic of this area.

36.     The Eastview proponents seek to provide area facilities for individuals entering retirement with a variety of care needs. Some Eastview residents will live independently in the cottages; others requiring some regular care but still wanting a degree of independence may seek residence in the Inn's apartments; as a person's medical or other needs increase, Eastview will afford residential opportunities in the Inn's other facilities. Some Eastview residents may experience an even greater need for medical and other support services, such that they choose to relocate to Porter Nursing Home.

37.     Portions of the Inn contain two floors; other portions contain a single floor. The Inn is sited to allow some of the pre-existing views to remain largely intact, particularly from Porter Nursing Home and the areas south of the Project site along South Street Extension. The Inn is set back from the road, with many trees and other landscape plantings to minimize its mass and adverse impact on the area's beauty. While significant in size, the Inn will not appear greater in height or mass than the adjacent Porter Medical facilities. It will transform the immediate area views, but will not completely obscure the majestic views of the Green Mountains in the background, and will not impact the views a traveler enjoys once past Eastview, particularly when heading further south along South Street Extension. An example of the estimated site impact is shown on Eastview Exhibit 25, Bates Stamp pages 398a and 390.

38.     Architectural renderings of the Inn and Cottages, also reflected in Eastview Exhibit 25, evidence designs that allow the Eastview buildings to incorporate characteristics of the eclectic

---

[11] The Town Plan amendments are addressed in more detail below in the discussion of Criterion 10.

residences in the area and other rural residences. The use of multiple facades and color tones on the Inn decrease the visual predominance of the building and allow it to blend into its landscape and with the nearby Porter Medical structures. When viewed from the south, the Eastview structures will blend into the surrounding area and do not evidence an adverse distraction from that setting.

39.     As noted above, the cottages are clustered around the southerly and easterly edges of the Inn. This design revision[12] reduces the visibility of all cottages from South Street Extension. The cottages are sited so as to allow views to the east to be unobstructed, in intervals within the Eastview site.

40.     The Eastview Project, both during construction and once completed and in full operation, complies with the Town noise regulations and will not generate significant or adverse noise impacts, particularly in light of the primary parties' Stipulation for Noise Conditions (filed September 6, 2007), which we will direct to be incorporated as permit conditions.

41.     The Project site was not shown to contain any historic sites, nor were such historic sites identified in the area.

### Conclusions as to Criterion 8.

Section 6086(a)(8) directs that we determine whether the Eastview Project, as proposed, will "have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable areas." We recognize that Criterion 8 presents a two-part set of subjective tests and therefore look for guidance from prior decisions of the former Environmental Board and the Vermont Supreme Court in making our Criterion 8 determinations.

The starting point in our analysis is the former Environmental Board decision in an appeal brought by the then-developer of the Quechee Lakes development. The project had its origins just a short time after the creation of Act 250. See In re: Application of Quechee Lakes Corp., 130 Vt. 469 (1972). In 1981, the corporation obtained an Act 250 land use permit to build a twenty-eight unit condominium project on a high ridge overlooking the Quechee valley. See In re: Quechee Lakes Corporation, 154 Vt. 543, 546 (1990). During construction of the project, the developer made substantial changes to the project without seeking a permit amendment or other authority from the district commission. Id. Quechee Lakes ultimately sought an amendment to

---

[12]   At the Town Board's suggestion, Eastview reduced the number of cottages (from 50 to 30) and brought them into a more clustered setting around the Inn. The cottages were once sited on a broader expanse along South Street Extension.

its permit to authorize the pre-existing changes to construction, which included "the addition of skylights, the enlargement of sliding glass doors, the addition of clerestory and other windows, a fourteen-foot increase in the depth of three of the six buildings, the addition of four-foot overhangs and wrap-around decks, a reduction of roof pitches, and the relocation of some buildings." Id. The Court went on to note that the Environmental Board had found that, "taking the skylights and additional glazing together, approximately two-thirds more glass was visible than was approved under the original plans; that light from the windows and skylights is visible from many points in the valley at night; and that reflective glare from these sources results in a significant visual impact even during cloudy days [and] that some of the other construction changes increased the perceived mass of the project." Id. at 547.

The former Environmental Board took a then-innovative approach in analyzing Quechee Lakes's permit amendment application. In 1985, the Board retained a landscape architect as an expert witness to provide testimony, together with the parties' witnesses, to explain how professionals go about evaluating the aesthetic impacts of proposed developments.

The Board first announced how it had previously defined the required analysis under Criteria 8 by stating that

> The term "undue" generally means that which is more than necessary -- exceeding what is appropriate or normal. The word "adverse" means unfavorable, opposed, hostile. "Scenic and natural beauty" pertain to the pleasing qualities that emanate from nature and the Vermont landscape. In short, through Criterion 8 the Legislature has directed that no project within our jurisdiction be approved if it has an unnecessary or inappropriate negative impact on the enjoyment of surrounding natural and scenic qualities.

Re: Quechee Lakes Corp., Docket Nos 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order slip op. at 17 (Vt. Envtl. Bd. Nov. 4, 1985) (quoting Re: Brattleboro Chalet Motor Lodge, Inc., Docket No. 4C0581-EB (Vt. Envtl. Bd. Oct. 17, 1984)). The Board went on to note that "[w]hile this description helps in understanding the terminology of Criterion 8, it does not identify the process which we believe appropriate in applying this terminology to specific projects." Id. The Board then announced a process by which the aesthetics impact of Act 250 projects continue to be analyzed, more than 22 years later.

The Supreme Court affirmed the Environmental Board decision. Quechee Lakes Corporation, 154 Vt. at 559. While the Court did not announce a specific adoption of what has later come to be known as the "Quechee test," the Court noted that the Board "displayed a

commendable determination to adhere to the question before it, i.e., the adverse impact, if any, of" the proposal before it.  Id. at 556.

In later decisions, our Supreme Court has repeatedly announced its approval of a fact finder's use of the "Quechee test" in its review of a project's aesthetic impact.  In re McShinsky, 153 Vt. 586 (1990).[13]  Most recently, the Supreme Court articulated the analysis under the Quechee test in the following manner:

> The Board employs a two-pronged approach to determine if an application complies with Criterion 8.  First, it determines if the proposed project will have an adverse aesthetic impact, and if so, it considers whether the adverse impact would be undue.  An adverse impact is considered undue if any one of the three following questions is answered in the affirmative:  (1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings.

In re: Appeal of Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8 (citations omitted). It is indisputable in light of this precedent that we must apply the Quechee test in our analysis of the Eastview Project under Criterion 8.  We therefore will now endeavor to apply our factual determinations to this test.

We view Eastview's potential impact in two components:  its impact upon the area to the north, and its impact upon the area to its south.  Eastview's design and siting make it a suitable addition to the surrounding developments to the north.  This area is a short distance from the Middlebury village center; residents and visitors often walk the one mile distance to the College athletic fields and the Porter Medical facilities.  The Inn and cottages at Eastview will fit in well with their neighboring developments to the north.  Viewing Eastview from the south and in the foreground of the Porter Medical facilities will appear as a natural complement to the development in the area.  Eastview will not have an adverse impact on the developed areas along South Street.

Viewing Eastview solely in the context of the undeveloped areas that lie south or Porter, we conclude that the Project will be a significant departure from the pre-existing natural beauty of the area.  In making this determination, we find guidance in the original articulation of the

---

[13]  Although reported in an earlier volume, McShinsky cites to the Quechee Lakes Corporation decision and specifically announced the Supreme Court's approval of the "two-pronged analysis developed in an earlier Board decision . . .." McShinsky, 153 Vt. at 589, 591.

first "prong" of the Quechee test: a development such as Eastview, considering its mass and multiple components, is not readily in "harmony" with the surrounding undeveloped lands and scenic beauty to the south of the project site, which has an undisputable "particular scenic value." In re: Quechee Lakes Corp., Docket Nos 3W0411-EB and 3W0439-EB, at 18. We therefore conclude that the impact of Eastview upon the southerly areas of South Street Extension will be adverse.

The question remains: will Eastview's impact on this area be "unduly adverse," thereby rendering it a bar to this development. The Times & Seasons Court, cited above, provided the necessary guidance here, in its summary of the second prong of the Quechee test.

First, we note that the Middlebury community has recently revised its community standards for development in this area. Recent amendments to the Town Zoning Regulations extended the boundaries of the Institutional Zoning District to include the Eastview Project site. A development such as Eastview is a permitted use in this District. Both the Middlebury Design Advisory Committee and the Town Planning Commission determined that the Eastview Project complied with the applicable Zoning Ordinance provisions, including those relating to building height, setbacks, density and lot coverage. Recent amendments to the Town Plan specifically reference a project such as Eastview, at this site. The Plan notes that such a project needs to be sensitive to the important natural surroundings. Most important in our analysis, we note that we have not been presented with any "written community standard" that the Eastview Project specifically violates, so as to render it an unduly adverse development in this area. In re: Appeal of Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8.

We understand the concerns Appellants and some of her neighbors have sincerely expressed about the change to their neighborhood that Eastview will bring. But to suggest, as some witnesses or affiants did, that Eastview would lead to a complete destruction of the area's natural beauty is, quite frankly, not credible. The Eastview design, particularly after several revisions, incorporated Town suggestions and design characteristics from area homes, including Appellant's, and provides a complement and not an offense to the area. In this regard, we note that the concerns expressed by Appellant's expert were based upon a distorted rendering of the Eastview Inn and lacked credibility. While Eastview will now be in the foreground of a portion of the scenic views from South Street Extension, it has been designed, landscaped and integrated into the area so as to not obscure all views. A visitor to South Street Extension will still enjoy a

broad expanse of scenic beauty. The sensibilities of the average person will not be offended by Eastview.

Lastly, we note that Eastview has solicited suggestions from Town officials and others for ideas on how the impacts from its Project can be mitigated. It has incorporated many of those mitigation suggestions into its design revisions. The number of cottages has been reduced; their siting is more clustered and encroaches upon a reduced area along South Street Extension, thereby affording a greater distance in which visitors may enjoy the scenic beauty of the area to it south. Traffic mitigation measures to be employed by Eastview along South Street may actually bring improvement to, rather than degradation of traffic flow and aesthetic appearance of the neighborhood. Landscaping, color schemes and design patterns will disguise the mass of the Eastview buildings and bring them into context with the abutting neighborhood. These mitigation steps taken by Eastview are commendable; they will improve the harmony of the proposed project with its surroundings.

For all these reasons, we conclude that the Eastview Project will have an adverse impact on the scenically beautiful areas of South Street Extension, however, such impact will not be undue, because of the mitigation steps, conformance with established community standards and absence of offense to an average person's sensibilities. The Project conforms with and is not adverse to its surroundings to the north. The Project as a whole conforms to Act 250 Criterion 8.

**C.    Will the Eastview Project significantly affect the community's capacity to accommodate area growth?**

42.    Estimates placed the Town's population as of the 2000 National Census at about 8,183 individuals. Reliable estimates, using data from the Vermont Department of Health and the Addison County Regional Planning Commission, place the Town's population at about 8,500 for 2005.

43.    Eastview has offered its independent residential units for "pre-sale," thereby providing some picture of where its residents will come from to live at the Eastview Project. About 70% of these pre-permit purchasers are currently residents of Middlebury or other Addison County towns. Even if all Eastview residents were from out of Town, which appears very unlikely, the Project would cause a very minor population increase in Town, estimated at around 1.6%.

44.    Although Eastview is established as a not-for-profit entity, it has not requested exemption from local property taxes, which were reliably estimated at trial to be about $300,000 per year. Given its intended purpose, the Project is not likely to add school-age children to the Town

17

population.  The Town, both through the written determinations of its Planning Commission and the trial testimony of its Planning Director/Zoning Administrator, provided reliable evidence that the net financial impact of Eastview upon the Town will be positive.

45.     As noted above, Eastview has proposed to pay for an extension to its site of the municipal water and sewer lines that now end at the adjacent Porter Medical facilities.  Eastview will also pay for the traffic mitigation measures, described above, along South Street.

46.     Eastview's extension of the municipal water and sewer lines will allow the existing homes across from the Project site to hook up to the municipal lines, at the homeowners' election.  These homes are currently served by on-site wells and sewage disposal systems.

47.     Because the municipal water and sewer lines are only being extended from the adjacent lot, Eastview's plan is unlikely to encourage further development along South Street Extension.  Growth is sometimes encouraged when municipal services are extended over a multi-lot distance, thereby making development more attractive and affordable on the intervening lots.  Eastview will not cause such secondary impact to the area's growth.  For purpose of this conclusion, we also note that all immediate area to the south is owned by Middlebury College.  The past practices and expressed future plans for this College land make further private development in this area unlikely, particularly as a direct or secondary consequence of the Eastview Project.

48.     Just beyond the Eastview site, the zoning district changes to Agricultural/Rural Residential, with lands farther south in the Flood Hazard District.  These zoning districts have restrictions on development not found in the Institutional District.

49.     Once construction is complete, Eastview will employ about 45 full-time staff, most of whom are expected to be residents from the area.

50.     Officials from the area's police, fire and other emergency responding services have all provided written confirmation of their ability to serve Eastview's anticipated needs.

#### Conclusions as to Criterion 9(A).

Section 6086(a)(9)(A) directs that, "tak[ing] into consideration the growth in population experienced by the town and region" we determine whether the Eastview Project, as proposed, "would significantly affect [the town and region's] existing and potential financial capacity to reasonably accommodate both the total growth and the rate of growth otherwise expected for the town and region . . .."  With this perspective in mind, we conclude that the Eastview project will

not likely restrict the area's ability to accommodate its expected growth. In fact, all credible evidence leads us to conclude that Eastview will bring a net financial benefit to the Town.

Municipal improvements will need to be made to accommodate the Eastview Project. Yet, the Town will not shoulder the costs for these improvements, because Eastview has committed to pay for them. The traffic mitigation measures Eastview proposes are not driven wholly by the increase in traffic along South Street that Eastview may cause. Thus, particularly since Eastview has committed to pay for these improvements, the Town will enjoy the benefit of traffic mitigation along this roadway that is currently enjoyed by many travelers, including walkers, bicyclists, college students and residents.

Employment during Eastview's construction and operation will provide additional full-time jobs for area workers. But several of the characteristics of a completed residential development that often cause added expenses to a host municipality will not be evident at Eastview. Only some of its residents are expected to own private vehicles; none of its residents are expected to enroll in area public schools, so as to add to the Town's educational expenses. Since most Eastview workers are expected to already be area residents, their children are not expected to add significantly to the educational expenses of area towns.

Eastview is unlikely to be the direct or indirect cause of future growth, given the characteristics of the project and its residents, and the pre-existing restrictions that Middlebury College has historically placed upon the surrounding lands that it owns. Since the municipal water and sewer lines extension is limited to one lot (the Eastview lot) and will not travel over other lands, Eastview is unlikely to encourage secondary growth from the mere extension of municipal services to its Project site.

In sum, Eastview is unlikely to burden the Town with growth expenses and will likely bring a net financial benefit to Town coffers. Eastview serves as a beneficial complement to the Town's expected and desired growth. As proposed, Eastview conforms to Act 250 Criterion 9(A).

### D. What impact will the Eastview Project have on primary agricultural soils?

51. The Eastview site contains 40 acres, 30 acres of which Eastview proposes to develop for its project. Of the 30 acres to be developed, about 20 acres[14] can be described as primary

---

[14] Several admitted exhibits, including the Mitigation Agreement (Exhibit 40) referenced in ¶ 58, below, suggest that the Eastview site contains 30 acres of primary agricultural soils. We conclude that this includes the 10 acres Eastview has pledged to leave undeveloped and about 20 acres of the to-be-developed lands. Some of the lands

agricultural soils. While most of the soils on the Eastview site, and most of the surrounding lands, are classified with an agricultural rating of 6, on a scale of 1 to 8, and are thereby valuable, some of the lands on the Eastview site are occupied by wetlands and rock-ledge.

52. The Eastview site had historically been mowed and well maintained by the College, but had not often or frequently been used for agricultural purposes. In the recent past, some of the Eastview site and surrounding lands have been leased for agricultural purposes, although at a per-acre rate far below the market rate. Nonetheless, it appears indisputable that the majority of the Eastview site and much of the Middlebury College lands to the south constitute primary agricultural soils.

53. Eastview does not own, lease or have an option on any other area lands.

54. Eastview's rights to develop lands of Middlebury College are limited to the 40-acre Project site. Eastview does not have the right to occupy, enter upon, develop or manage any other lands of Middlebury College.

55. Extensive un-contradicted and reliable testimony was offered at trial that Middlebury College's other undeveloped land holdings consist of approximately 1,500 acres, most of which contain primary agricultural soils and none of which will have the needed access to municipal and medical facilities contemplated by Eastview.

56. Eastview has committed to imposing a condition upon all of its residents, in consideration of their use of the Eastview facilities, that the residents shall not protest or otherwise object to the reasonable agricultural use of adjacent lands, thereby removing the potential of future Eastview residents interfering in such use of adjacent primary agricultural soils.

57. Eastview originally planned to lease and develop 30 acres of Middlebury College land. It then agreed to increase the leased land to 40 acres. Ten acres of the total 40-acre parcel will not be developed. Eastview also reduced the total number of units from 116 to 101 and further clustered the to-be-developed area, so as to reduce the amount of agricultural soils impacted.

58. Eastview entered into negotiations with two entities,[15] the result of which was an agricultural Mitigation Agreement (Eastview Exhibit 40). This document evidences that Eastview will pay the sum of $62,666.40 to the Vermont Housing and Conservation Board,

---

Eastview proposes to develop contain several wetlands and rock outcroppings, making the agricultural use of these portions difficult. Our estimate of the primary agricultural soils is supported by trial testimony, including that put into context by the site visit.

[15] The Vermont Agency of Agriculture, Food & Markets and the Vermont Housing and Conservation Board.

which monies are to be used in furtherance of the goals of "maintaining an active agricultural and forest industry, including the transfer of development rights, and farmer assistance programs as set forth in 24 V.S.A. § 4302(a) . . . ." Exhibit 40, Bates Stamp page 501.

59. The Eastview payment referenced in the Mitigation Agreement was based upon a doubling of the per acre price "determined by the Vermont Agency of Agriculture, Food and Markets and based upon information provided by the Vermont Land Trust to be the cost to purchase conservation easements on productive agricultural lands in the Middlebury area in close proximity to the [Eastview] Project site . . . ." Id. This agreement reasonably assures that primary agricultural soils of equal or greater value than those on the Eastview site, in an acreage amount of up to double that on the Eastview site, will be preserved for agricultural use.

### Conclusions as to Criterion 9(B).

Section 6086(a)(9)(B) directs that we determine whether the Eastview Project, as proposed, "will . . . result in any reduction in the agricultural potential of the primary agricultural soils . . . ." If we determine that it does cause such an impact, the project may still conform to Criterion 9(B), if certain sub-criteria are met. Thus, we first address the Project's impact on primary agricultural soils.

The extensive evidence at trial revealed an undisputed fact: that as much as 30 acres of the Eastview site contains primary agricultural soils and that the Eastview Project will permanently convert 20 acres of those agricultural soils to residential and institutional uses. We therefore conclude that the Eastview project will result in a "reduction in the agricultural potential of primary agricultural soils…." 10 V.S.A. § 6086(a)(9)(B). Conformance with Act 250 Criterion 9(B) can therefore only be had if the Eastview Project complies with the sub-criteria of § 6086(a)(9)(B). Those sub-criteria specify that:

> (i) the development or subdivision will not significantly interfere with or jeopardize the continuation of agriculture or forestry on adjoining lands or reduce their agricultural or forestry potential; and
>
> (ii) except in the case of an application for a project located in a designated growth center, there are no lands other than primary agricultural soils owned or controlled by the applicant which are reasonably suited to the purpose of the development or subdivision; and
>
> (iii) except in the case of an application for a project located in a designated growth center, the subdivision or development has been planned to minimize the reduction of agricultural potential of the primary agricultural soils through innovative land use design resulting in compact development patterns, so that the

21

remaining primary agricultural soils on the project tract are capable of supporting or contributing to an economic or commercial agricultural operation; and

(iv) suitable mitigation will be provided for any reduction in the agricultural potential of the primary agricultural soils caused by the development or subdivision, in accordance with section 6093 of this title and rules adopted by the land use panel.

Conformance with Criterion 9(B) may only be had if all four of these conditions are met. We conclude that they are. No aspect of the Eastview project will interfere with the adjoining agricultural lands, particularly those owned by Middlebury College. Eastview has secured no right to enter upon these lands or develop them in any way. The ten-acre portion of the Eastview parcel that will remain undeveloped will serve as a buffer between the development and the adjoining agricultural lands; the Eastview development has been designed and redesigned so as to be aligned closely with the already developed adjoining lands of Porter Medical. Eastview has even committed to binding its future residents to a restriction on protesting or otherwise objecting to the reasonable agricultural use of adjacent lands, thereby removing the potential of future Eastview residents interfering in such use of adjacent primary agricultural soils.

Recent amendments to the Town Plan, discussed in more detail under Criterion 10, suggest that the Town has expanded its designated growth center to include the Eastview site. But even if we were to conclude that the prior Town Plan, with its designated growth center not including Eastview, was applicable here, we conclude that the remaining sub-criteria of § 6086(a)(9)(B) have been met. Neither Eastview, nor its Co-Applicant, Middlebury College, own lands, other than primary agricultural lands, that are suitable for the Eastview Project. No other lands even remotely register the benefits of access to municipal services and hospital facilities that the planned Eastview site enjoys.

The Eastview lands reserved from development are capable of contributing to an economic or commercial agricultural operation, particularly if joined with the other agricultural lands located nearby. In anticipation of concerns about Eastview's impact upon the remaining agricultural lands on its site, Eastview has entered into a Mitigation Agreement that is crafted to assure the security of nearby agricultural lands that could be double in size to the lands Eastview impacts. We therefore conclude that subsections 10 V.S.A. §§ 6086(a)(9)(B)(i)–(iv) have been met and that Eastview, as proposed, is in conformance with Act 250 Criterion 9(B).

**E.  Does the Eastview Project conform to the applicable Town Plan?**[16]

60.    Eastview first filed its Act 250 application several months before the then-existing Town Plan expired by its terms.  An amended Town Plan was then adopted on June 21, 2005 (the "2005 Town Plan").  The 2005 Town Plan was further revised, along with the adoption of interim zoning amendments referred to in the revised Plan.  We refer to this next Plan as the "Amended 2005 Town Plan."   It was this Amended 2005 Town Plan that the District Commission relied upon in rendering its Decision.

61.    The Town enacted further amendments to its Town Plan which became effective on June 19, 2007 (the "2007 Town Plan")

62.    The Amended 2005 Town Plan and related zoning amendments place the Eastview Project wholly within the Institutional Zoning District.

63.    The 2005 Town Plan expressly contemplates the Eastview Project (at its present location), encourages its development, and specifically notes the suitability of this location for a project such as Eastview.  Amendments in 2005 and 2007 did not change these Town Plan provisions.

64.    In making specific reference to the Eastview Project, the 2007 Town Plan specifically notes that the Eastview Project, "operated in conjunction with the [Porter] Nursing Home and of financial benefit to Porter, is in conformance with the Town Plan and is desirable both for the Porter Medical Center and for the community's needs for assisted living facilities for its aging population."  2007 Town Plan § 9.8 (pages 99–100; Eastview Exhibit 49, Bates Stamp 1394–5).

65.    No credible evidence was offered of a specific provision in the 2005 Town Plan, the Amended 2005 Town Plan, or the 2007 Town Plan that the Eastview Project contradicts.

66.    The 2007 Town Plan also clarified and revised the scenic road designation of South Street Extension by noting that the designation began "south of the Institutional Zone."  Id. at p. 132; Bates Stamp 1427.  This change resulted in the scenic road designation beginning only after one travels beyond the Eastview Project site.

---

[16]  10 V.S.A. § 6086(A)(10) directs that a determination be made of whether a proposed project conforms "with any duly adopted local or regional plan or capital program under chapter 117 of Title 24."  However, Appellant's Statement of Questions only preserves for our review the issue of Eastview's conformance with the "municipal plan."  Appellant's Statement of Question No. 7.  Thus, we only address Eastview's conformance with the applicable Middlebury Town Plan; the District Commission determinations as to the applicable regional plan or capital program remain unchallenged.

**Conclusions as to Criterion 10.**

A town plan can be the most important document that a community crafts, as it can establish the community's short- and long-term goals for growth and preservation. Because town plans often use advisory language, some portions of town plans have been held to be more abstract in their content and not of sufficient specificity to give adequate notice of land use restrictions. Times & Seasons, 2008 VT 7, ¶ 21. Zoning ordinances are the municipal document that provides specific notice of land use restrictions. See id. at ¶ 22 (contrasting specific, enforceable zoning laws with unspecific, advisory, but not enforceable town plans)(quoting In re: John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520)). Nonetheless, 10 V.S.A. §6086(a)(10) directs that we determine if the Eastview project, as proposed, conforms or is in specific conflict with the provisions of the applicable town plan.

We must first determine which town plan applies. While often an easy determination, as the general rule is that the plan in effect when the applicant submitted its complete application is the plan that applies, In re: Appeal of Jolley Associates, 2006 VT 132, ¶ 11 (citing Smith v. Winhall Planning Comm'n, 140 Vt. 178, 181–82 (1981) and In re Raymond F. Ross, 151 Vt. 54 (1989)), the procedural scenario that accompanies the Eastview Project application is not so simple. For the reasons noted below, we conclude that the 2007 Town Plan is what must be applied to the Eastview Act 250 application.

Where a community has taken affirmative steps to amend its local plan to support a proposed project, as occurred here, it would appear imprudent for those revisions to be ignored in the review of a pending application. Here, the community sought to amend its local plan twice during the pendency of the Eastview applications, each time to add plan language expressing the need for such a facility and the desirability of locating it adjacent to the Porter Medical facilities. Our conclusion that the Eastview Project conforms to the local plan applies to the 2007 Town Plan, the Amended 2005 Town Plan and the 2005 Town Plan. We find no specific provision in any of these town plans that the Eastview Project, as currently proposed, offends.

Eastview has expressed its consent and preference that the 2007 Town Plan be the document that governs its application. Nearly ten years ago, the former Environmental Board established that "Town Plan amendments which occur after the application date and which favor an applicant . . . govern . . . [when the applicant] has requested that his Project be governed by

24

the [subsequent] Town Plan." Re: Peter S. Tsimortos, Docket No. 2W1127-EB, Findings of Fact, Conclusions of Law and Order slip op. at 18 (Vt. Envtl. Bd., April 13, 2004) (citing Re: Fred and Laura Viens, Docket No. 5W1410-EB, Memorandum of Decision slip op. at 4–5 (Vt. Envtl. Bd., Sept. 3, 2003) and Re: Juster Development Corp., Docket No. 1R0048-8-EB, Findings of Fact, Conclusions of Law and Order slip op. at 33 (Vt. Envtl. Bd., Dec. 19, 1988)). We agree with the Environmental Board's rationale here and conclude that the 2007 Town Plan is the plan that is applicable to the Eastview project.[17] We further conclude that the Eastview project is in conformance with all applicable provisions of the 2007 Town Plan and thus conforms to Act 250 Criterion 10.

### F. What constitutes "involved land" for the Eastview Project?

67.    Eastview proposes to possess, develop and occupy its 40-acre site pursuant to the draft Ground Sublease. Exhibit 11.

68.    Eastview represents that Porter Medical, as the lessor under the Ground Sublease, will be authorized to lease the site to Eastview pursuant to a long term land lease from the current fee owner of the property, Middlebury College. The Middlebury College lease to Porter will contemplate and authorize the sublease to Eastview of the exclusive rights to possess, develop, occupy, and otherwise conduct the Eastview project.

69.    Middlebury College has agreed to lease the Eastview site under the terms represented by Porter Medical and Eastview, for a term of 99 years.

70.    The College will retain ownership and control over its remaining 344± acres of land. Current plans for this land are for it to remain undeveloped, subject to agricultural leases to area farmers. Neither Porter nor Eastview will have authority to enter upon, develop or control any portion of the College's lands in any way.

71.    Upon financial default, Eastview, its successors or assigns could lose the right to possess, develop, occupy and otherwise operate the Eastview Project. Such rights would only be involuntarily transferred by way of a legal action in the appropriate court.

---

[17]  Our conclusion here is not particularly important to our analysis, as we find no provision of any of the applicable plans could be viewed as a barrier to the Eastview Project. We decline to adopt Appellant's argument that the 2005 Town Plan, or even its predecessor from 2000, should apply to the Eastview Project, since we conclude that Appellant's legal analysis on this point lacks merit.

## Conclusions as to "Involved Land".

The final dispute to address in this proceeding is whether all adjoining lands of Middlebury College are controlled by any permit that may issue from these proceedings. The District Commission so ruled in its Decision; both Eastview and Middlebury College, as its Co-Applicant, appealed from that determination and now seek an opposite conclusion from this Court. To address this issue, we again turn to prior decisions of our Supreme Court and the former Environmental Board.

Since the birth of Act 250, developers have attempted to avoid its jurisdiction and limit its scope, perhaps mostly due to the costs associated with obtaining a state land use permit. One area of continuing dispute has been the question of what lands are encumbered by an Act 250 permit. Any "construction of improvements on a tract or tracts of land, owned or controlled by a person, involving more than 10 acres of land . . . in a municipality that has adopted permanent zoning and subdivision bylaws" is defined as "development" for purposes of Act 250 proceedings. 10 V.S.A. § 6001(3)(A)(i). Those intending to construct a development must obtain an Act 250 permit. 10 V.S.A. § 6081(a).

What constitutes a "tract or tracts of land" that can be encumbered by an Act 250 permit has been the source of much litigation. See In re Gerald Costello Garage, 158 Vt. 655 (1992) (mem.), Committee to Save the Bishop's House, Inc. v. Medical Ctr. Hospital of Vt., 137 Vt. 142 (1979), and In re Stokes Communications Corp., 164 Vt. 30 (1995). The Supreme Court has affirmed the Environmental Board determination that a "tract of land" for jurisdictional purposes includes all contiguous land in common ownership, regardless of the functional relationship between the parcels. Costello Garage, 158 Vt. at 656. Thus, in this proceeding, the District Commission deemed all contiguous lands of Middlebury College, the present owner of record of the proposed Eastview parcel, as well as the adjoining 344± acres of undeveloped land, to be subject to its Permit. The College is a Co-Applicant in this proceeding for the sole reason that it is the current owner of the Eastview site and the adjoining lands; the College does not intend to participate in the Eastview development in any manner, other than offering the site for lease to Eastview.

The Vermont Supreme Court has concluded that in some instances, the land encumbered by an Act 250 permit cannot be limited to lands leased from the owner. In Stokes Communications, 164 Vt. at 37, the Court reasoned that a lease of one acre of a ninety-three-and-

26

one-half-acre parcel, for a term of thirty years, for the purpose of installing a 303-foot telecommunications tower did not equate "to ownership and control of the parcel." 164 Vt. at 37. We find the facts of Stokes not analogous to the more extensive control rights to be enjoyed by Eastview in this case.

Eastview will enjoy exclusive control and possession of all lands needed in its proposed development. While all facts concerning Stokes Communications's lease of one acre from the landowner are not expressed in the Supreme Court decision, we find it difficult to believe that Stokes's extensive communication facilities, with multiple support structures and access to the hillside site, would all occur on the one-acre leased parcel. Stokes, 164 Vt. at 32-33. The Stokes Court also wrestled with a separate legal principle: Stokes attempted to secure a determination that only its one acre of leased land should be considered, so that it could avoid Act 250 jurisdiction. Id. at 37. Eastview is making no such argument here. We do not find the precedent of Stokes controlling here.

We note that the Legislature has directed that agricultural lands devoted to farming activities, as defined in 24 V.S.A. § 6001(22), shall not be included as involved lands when a development is proposed for a separate portion of the agricultural parcel. 24 V.S.A. § 6001(3)(E). Some, although not all, of the College's remaining lands fit this exclusionary definition, since about 140 acres will continue to be leased for agricultural purposes.

The Environmental Board has established precedent to relieve applicants of absurd results that could follow a draconian application of the involved land doctrine. The applicant in Re: West River Acres/Winchester Stables/Nicholas Mercedes, Docket No. 2W1053-EB, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. July 16, 2004) sought permit approval to alter a cattle barn and reconstruct a demolished barn on his Newfane-area horse farm. Mr. Mercedes and members of his family had extensive land holdings in the area. Due to their farm's pre-existence, it had not previously been required to obtain Act 250 approval. When addressing whether it was appropriate to consider all of the Mercedes's area land holdings as involved land, the Environmental Board concluded that it was not, reasoning that "the occasional use of the contiguous parcels by boarders or members of the general public [while riding horses boarded at the Mercedes's facilities] has virtually no environmental impact under the Act 250 Criteria." Id. at 10.

27

The Board in West River Acres relied upon its own precedent in Stonybrook Condominium Owner's Association, Declaratory Ruling #385, Findings of Fact, Conclusions of Law, and Order (Vt. Envtl. Bd. May 18, 2001). The Board in Stonybrook reasoned that in those instances in which the permittee establishes that only a smaller portion of its tract has a nexus to or is actually impacted or affected by the proposed construction, a limiting of the lands encumbered by the permit was appropriate. Id. at 17. The Board reasoned that if it were to require that "without exception, . . . the entire tract be included," even when "a small project was proposed on a large tract . . . inequitable or absurd results could follow." Id. at 17–18.

We see such an absurdity resulting from the inclusion of the College's remaining 344± acres. In our above analysis of the Act 250 Criteria appealed in this proceeding, the facts have directed us to a set of consistent conclusions: no activity connected to the Eastview Project will occur on or impact upon the remaining 344± acres of College land. We therefore conclude that a proper conclusion here is to limit the permit's encumbrance to only the lands to be leased to Eastview for its project, since no other portion of the College's lands will be included in the Eastview development.

In considering this issue, Appellant has made much of the possibility that, in the event of financial default, Eastview may lose its rights to the developed parcel and the improved lands could revert to Middlebury College. Act 250 permits, findings and conclusions run with the land and bind successors in interest. Act 250 Rule 33(C)(3).[18] It appears safe to assume that in the history of Act 250, many projects were made possible by mortgage financing; some of those projects may have defaulted on their mortgage terms, resulting in title being involuntarily transferred to the mortgage holders. Despite this reality, Act 250 Rules and the applicable provisions of Title 10, Chapter 151 do not require that current or future mortgage holders be named as co-applicants. We conclude that the continued jurisdiction over Middlebury College and its undeveloped lands is no more necessary here than to have an applicant's mortgage holder named as a co-applicant in the initial permit proceedings.

## III.  Order.

For all the reasons stated above, we conclude that the Eastview project, as proposed, will not cause or result in a detriment to the public health, safety or general welfare under the

---

[18]  The Vermont Natural Resources Board has promulgated rules that govern district commission proceedings. We are directed to apply "the substantive standards that were applicable before the tribunal appealed from . . .." 10 V.S.A. § 8504(h). Rule 33(C)(3) has remained unchanged since prior to Eastview's filing of its Act 250 application.

applicable Act 250 Criteria preserved for our review in this appeal, provided its operation conforms with Eastview's application and all exhibits submitted, and provided that its construction and operation conform to the terms and conditions referenced in the Permit that we direct be issued.

We specifically remand these proceedings back to the District #9 Environmental Commission, pursuant to V.R.E.C.P. 5(j), so that the District Commission may complete the ministerial act of issuing a Permit which incorporates the provisions of this Decision and the provisions of its October 6, 2006 Permit that were not appealed in these proceedings. The Commission is directed to incorporate into this new Permit the necessary conditions to enforce the provisions of this Decision, including the Stipulation for Noise Conditions, referenced in ¶ 40, above, the Agricultural Mitigation Agreement, referenced in ¶ 58, above, and that the Ground Sublease and long-term land lease between Middlebury College, Porter Medical Center and Eastview be finalized in a form as represented and be fully executed, with memoranda of leases recorded in the Middlebury Land Records, before construction on the Eastview site commences.

All admitted trial exhibits are on file with the Environmental Court and will be transferred to the District Commission upon the expiration of all applicable appeal periods, upon Eastview's specific request. Eastview, its successors and assigns are directed to maintain a complete copy of its application and all admitted exhibits for so long as its Project is in operation, unless and until otherwise directed by this Court or the District Commission.

A V.R.C.P. 58 Judgment Order accompanies this Decision. This completes the proceedings pending before this Court in this appeal.

Done at Berlin, Vermont this 15th day of February, 2008.

_____
Thomas S. Durkin, Environmental Judge