# In re Stokes Communications Corporation

[664 A.2d 712]

No. 94-208

Present: **Allen, C.J., Gibson, Dooley, Morse and Johnson, JJ.**

Opinion Filed July 21, 1995

*Stephen R. Crampton* and *Dennis R. Pearson* of *Gravel and Shea,* Burlington, for Appellant.

*Gerald R. Tarrant* of *Tarrant & Marks,* Montpelier, for Appellees.

*Jeffrey L. Amestoy,* Attorney General, *John W. Kessler,* Assistant Attorney General, and *Kevin Forjette,* Law Clerk (On the Brief), Montpelier, for Amicus Curiae State of Vermont.

**Allen, C.J.** Stokes Communications, Inc. appeals from an Environmental Board decision, challenging the Board's jurisdiction over its 303-foot communications tower and the Board's authority to condition Stokes's Act 250 permit on the installation of light shields on the tower. We affirm.

Stokes owns and operates a commercial radio station in Randolph, Vermont. In 1982, Stokes leased one acre of a ninety-three-and-one-half acre parcel owned by Idora Tucker. The one-acre parcel was located on the crest of a small hill near Randolph Center, Vermont. With Tucker's consent, Stokes constructed a 120-foot radio transmission tower to service its radio station on the parcel. It did not obtain or apply for an Act 250 permit at that time.

In 1992, Stokes decided to increase the tower's broadcast power by extending its height and improving its transmission facilities. After plans for the 303-foot replacement tower were approved by the Federal Communications Commission (FCC), Stokes renegotiated its

lease with Tucker. Stokes agreed to pay an amount equal to the annual real estate taxes on Tucker's entire tract in exchange for a thirty-year lease, renewable for one five-year term. At the same time, Stokes approached the district coordinator for Environmental District 3 to discuss whether an Act 250 permit would be required for the new tower. The district coordinator suggested that a permit would be necessary.

Stokes applied for a permit in July 1992. Five adjoining landowners intervened and were allowed to participate on criterion (1) (air pollution) and criterion (8) (aesthetics, scenic and natural beauty). See 10 V.S.A. § 6086(a) (identifying ten criteria for evaluating permit applications). After a hearing, the district commission concluded that the taller tower would not result in undue air pollution, but the tower, equipped with four Federal Aviation Administration (FAA) required aircraft warning lamps, would pose an adverse aesthetic impact. The commission granted a permit for the replacement tower, reasoning that there were "no generally available mitigative steps that would improve the harmony of the proposed project." The adjoining landowners appealed, challenging the commission's decision on criteria (1) and (8).

Stokes commenced construction in January 1993. The adjoining landowners moved to stay the construction, arguing irreparable harm. Later that same month, Stokes moved to dismiss the appeal, challenging the Environmental Board's jurisdiction. It argued that because an Act 250 permit was required only for developments involving more than ten acres of land, its one-acre leased parcel did not trigger the Board's jurisdiction. In March, the Board denied the adjoining landowners' motion to stay, but warned Stokes that in the event the Board "denies or modifies the permit, [Stokes] will have to restore the site to its preconstruction condition." The Board also denied Stokes's motion to dismiss, concluding that the amount of involved land exceeded the jurisdictional minimum of ten acres.

During the pendency of appeal, Stokes negotiated with Contel Communications to sublease space on the tower for Contel's cellular telephone service. As part of the contract, Contel agreed to finance and construct the tower and antennas, but with extensive modifications. Stokes neither applied nor received approval for these changes. The adjoining landowners filed a motion to revoke Stokes's permit, claiming that the actual construction exceeded the scope authorized by the August 1992 permit. The Board consolidated the motion to revoke with the underlying appeal.

Following a de novo hearing, the Board found that construction deviated from the permit. The tower was twice the authorized width

and was equipped with four additional "whip" antennas. A forty-eight square-foot concrete slab for a backup generator was embedded near the tower, and a twelve-by-twenty-eight-foot equipment building was erected at its base. In addition, a new eight-foot-high, sixty-foot long ice bridge spanned between the existing utility shed and the new equipment building. All of the structures were enclosed by a six-foot high chain-link fence. After finding that the district commission had not authorized these changes, the Board concluded that there were grounds for revocation, but directed Stokes to apply for and diligently pursue an amended permit.

With respect to criterion (1), the Board agreed with the commission that the taller tower was more efficient and would cause no undue air pollution. Under criterion (8), the Board found that the 303-foot tower required four aircraft warning lights and bright orange stripes to comply with the FAA regulations for towers over 200 feet. Because the tower's lights "increase the visibility of the tower so that it dominates the landscape and unduly diminishes the aesthetic quality of the nighttime sky," the Board concluded that the tower would cause an adverse aesthetic impact. The Board explored alternatives to mitigate the effect of the warning lights. At the conclusion of the proceedings, the Board ordered Stokes to install light shields around the aircraft beacons within sixty days to ensure compliance with criterion (8). The Board then issued an amended permit and re-manded to the district commission for further proceedings on the unauthorized changes. Both Stokes and the adjoining landowners moved to alter the decision, primarily challenging the Board's author-ity to impose the light shield requirement without prior FAA ap-proval. The Board denied the motions.

Stokes now appeals the denial of its motion to dismiss for lack of subject matter jurisdiction and its motion to alter the decision by revising the light shield requirement. The adjoining landowners also filed a brief, requesting this Court to affirm the jurisdictional issue, but reverse and remand the light shield requirement. In addition, the Attorney General requested and was granted status as amicus curiae. He presented essentially the same arguments as the adjoining landowners.

■ Before we address the merits, we consider the adjoining landowners' standing to participate in this appeal. Eligibility to appeal an Environmental Board order to this Court is strictly limited to those parties expressly designated in the statute. *In re George Adams & Co.*, 134 Vt. 172, 174, 353 A.2d 576, 577 (1976). Section

6085(c) states: "For the purposes of appeal only the applicant, a state agency, the regional and municipal planning commissions and the municipalities required to receive notice shall be considered parties." 10 V.S.A. § 6085(c); see also *id.* § 6089(b) (appeal from decision of board shall be to supreme court as set forth by § 6085(c)). In *In re Wildlife Wonderland, Inc.*, 133 Vt. 507, 518-19, 346 A.2d 645, 652 (1975), we held that an adjoining property owner lacked standing to participate in the appeal to this Court even though he had appeared before the district commission and Environmental Board. In appropriate circumstances, V.R.A.P. 29 may provide the proper avenue for an interested person, who is not a statutory party, to participate in the appellate process. See, e.g., *In re Taft Corners Assocs.*, 160 Vt. 583, 588-89, 632 A.2d 649, 652-53 (1993) (interested property owners participated in appeal as amicus curiae after initial request to participate as appellees was refused). Because the adjoining landowners are not a proper party to this appeal and have not requested permission to join it as amicus curiae, their "participation in briefing and argument before this Court [is] inappropriate," and will not influence our decision. *In re Wildlife Wonderland*, 133 Vt. at 519, 346 A.2d at 652. The Attorney General is a proper participant because of his amicus status.

■■ We now turn to the jurisdictional issue.* Our review of the Board's decision is limited. We afford great deference to the Board's interpretation of Act 250 and have often recognized the Board's special expertise in determining whether it has jurisdiction over a particular development. *In re Taft Corners Assocs.*, 160 Vt. at 590, 632 A.2d at 653; *In re Denio*, 158 Vt. 230, 235, 608 A.2d 1166, 1169 (1992). Absent compelling error, we will uphold the Board's decision regarding the scope of its authority. *In re Taft Corners Assocs.*, 160 Vt. at 590, 632 A.2d at 653.

■ Pursuant to 10 V.S.A. § 6081, in towns with permanent zoning and subdivision bylaws, such as Randolph, construction of improvements for commercial purposes on a tract or tracts of land,

---

* Amicus argues that Stokes should be estopped from challenging jurisdiction because it waited five months after receiving its initial permit to challenge the Board's jurisdiction. This objection was never brought to the Board's attention by the adjoining landowners. 10 V.S.A. § 6089(c) (no objection that has not been urged before the Board may be considered by the Supreme Court). Because amicus was not a party below, it could not properly preserve the issue for appeal. Nevertheless, we need not decide the propriety of the estoppel claim, because of our disposition of the jurisdictional issue.

owned or controlled by a person, involving more than ten acres of land requires an Act 250 permit. See 10 V.S.A. § 6001(3) (defining development); *Committee to Save the Bishop's House, Inc. v. Medical Ctr. Hosp. of Vt.*, 137 Vt. 142, 151, 400 A.2d 1015, 1020 (1979). In determining amount of land involved for jurisdictional purposes, "the area of the entire tract or tracts of involved land owned or controlled by a person will be used." Envtl. Bd. R. 2(A)(2). "Involved land" is defined as:

(1) The entire tract or tracts of land upon which the construction of improvements for commercial or industrial purposes occurs; and

(2) Those portions of any tract or tracts of land within a radius of five miles owned or controlled by the same person or persons, which is incident to the use of the project; and

(3) Those portions of any tract or tracts of land within a radius of five miles owned or controlled by the same person or persons, which bear some relationship to the land actually used in the construction of improvements, such that there is a demonstrable likelihood that the impact on the values sought to be protected by Act 250 will be substantially affected by reason of that relationship.

*Id.* 2(F). Thus, Act 250 jurisdiction turns on whether the amount of involved land exceeds ten acres.

The Board has construed a "tract of land" for jurisdictional purposes to include all contiguous land in common ownership, regardless of the functional relationship between the parcels. We affirmed this construction in *In re Gerald Costello Garage*, 158 Vt. 655, 656, 614 A.2d 389, 390 (1992) (mem.).

In the present case, the one-acre parcel was created out of a ninety-three-and-one-half-acre lot owned by Tucker. There was no doubt that the one acre was contiguous to Tucker's remaining ninety-two-and-one-half acres. Tucker was the record owner of parcels; therefore, she was the owner of the tract upon which the improvement was located. The Board concluded, and we agree, that the project exceeded the jurisdictional minimum, because Tucker's entire ninety-three-and-one-half-acre tract was involved land.

Stokes contends that the amount of involved land is only one acre. It reasons that because the improvements on the one-acre parcel bear no functional relationship to the remaining acreage owned by Tucker,

the one-acre parcel is a separate and distinct tract. In support of its theory, Stokes relies on our decision in *Bishop's House*, in which we held that "land is involved within the meaning of 10 V.S.A. § 6001(3) only where it is incident to the use within the meaning of that section, or where it bears some relationship to the land actually used in the construction of improvements." 137 Vt. at 153, 400 A.2d at 1021. Notably, subparts (2) and (3) of Rule 2(F) reflect that decision. Stokes also argues that, by virtue of its nonrenewable thirty-year lease with Tucker, it effectively "owns and controls" the one-acre parcel. We disagree.

 Stokes's emphasis on *Bishop's House* and Rule 2(F)(2) and (3) is misplaced. Rules 2(F)(2) and (3) pertain to tracts which are physically separate from the improved tract. Rule 2(F)(1) addresses the size of the tract upon which the improvements are located. In this instance, Rule 2(F)(1) is controlling. See *In re Costello Garage*, 158 Vt. at 656, 614 A.2d at 390 (contiguous parcels held in common ownership are involved land under Rule 2(F)(1)).

 Moreover, we are not persuaded by Stokes's argument that the nature of its particular agreement amounted to ownership and control of the parcel. While the thirty-year lease provided Stokes with limited ownership interests, see *Guild v. Prentis*, 83 Vt. 212, 214, 74 A. 1115, 1116 (1910) (lessee allowed to maintain action as owner to recover treble damages for trespass), Tucker remained the record owner of the parcel. The Board may not disregard Tucker's owner-ship interests, simply because Stokes as the developer also main-tained an interest in the parcel. See *In re Spencer*, 152 Vt. 330, 337-38, 566 A.2d 959, 963 (1989) (rejecting argument that jointly owned parcel was separate and distinct from individually owned parcel for juris-dictional purposes). Under Stokes's approach, developers could cir-cumvent the administrative process by simply leasing parcels which do not exceed the jurisdictional thresholds. In light of the Legisla-ture's goals, we cannot endorse such a tactic.

Stokes's second challenge is to the Board's authority to require the installation of light shields. Stokes argues that the Board acted beyond its authority by requiring the installation of the light shields regardless of FAA approval and by not providing sufficient time to lawfully comply with such a condition. Stokes reasons that because the FAA's regulatory scheme over the nation's airspace is pervasive, prior FAA approval must be sought.

First, we do not construe the Board's order as imposing a condition regardless of FAA approval. The Board acknowledged the FAA's

overlapping jurisdiction and that Stokes would have to obtain FAA approval. It is fair to infer from the Board's comment that it realized the FAA could preempt its light shield requirement.

Second, as the Board concluded, "the fact that . . . [Stokes] may have to obtain FAA approval for the light shields does not prevent the Board from exercising Act 250 jurisdiction over the tower with regard to the light shields." The Board is an independent regulatory body with supervisory powers over environmental matters. *In re Hawk Mountain Corp.*, 149 Vt. 179, 185, 542 A.2d 261, 264 (1988). Pursuant to 10 V.S.A. § 6086(c), the Board may impose reasonable permit conditions within the limits of its police power to ensure that projects comply with the statutory criteria. See *In re Denio*, 158 Vt. at 239-40, 608 A.2d at 1172; *In re Quechee Lakes Corp.*, 154 Vt. 543, 550 n.4, 580 A.2d 957, 961 n.4 (1990). The Board is not obligated to delay its decision to accommodate concurrent state agency rulings. See *In re Hawk Mountain*, 149 Vt. at 185, 542 A.2d at 264 (Environmental Board not bound by approval or permits of other state agencies when imposing conditions for Act 250 permits). Under these circumstances, we see no reason why the Board should not require swift compliance with its directives, when the conflict between its order and an FAA determination is purely speculative.

"[S]tate law is pre-empted to the extent that it actually conflicts with federal law," *English v. General Electric Co.*, 496 U.S. 72, 79 (1990), but there is no actual conflict where a collision between two regulatory schemes is not inevitable. See *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 143 (1963); see also *English v. General Electric*, 496 U.S. at 90 (rejecting preemption argument that injured employees would forgo federal relief and rely solely on state remedies as too speculative). There was no evidence that compliance with both regulatory authorities would be impossible. In fact, the testimony was quite the opposite; Stokes's expert testified that based on his understanding of FAA regulation, "the shields will comply and the FAA will approve the use of the shields on the Stokes's tower." Additionally, Stokes has not offered any substantive support, such as citations to FAA regulations, suggesting that installing light shields prior to FAA approval is prohibited or that the shields would violate established requirements. Because there has been no showing of an inevitable collision between the Board's order and an FAA ruling, there is nothing to prevent the Board from imposing an otherwise lawful condition. Further, Stokes has not

shown how or why that sixty days is an insufficient time period to install the shields. Therefore, the time given to comply with the Board's order is also reasonable.

Next, Stokes contends that because the light shields have not been approved by the FAA, requiring their installation is not a "generally available mitigating step," and therefore exceeds the Board's authority. We will affirm the Board's decision if it is supported by substantial evidence and is a reasonable interpretation of its duly promulgated rules. *In re BHL Corp.*, 161 Vt. 487, 490, 641 A.2d 771, 773 (1994).

■ It has been the Board's practice to require applicants to take generally available mitigating steps to reduce the negative aesthetic impact of a particular project. See *In re McShinsky*, 153 Vt. 586, 591-92, 572 A.2d 916, 919-20 (1990). Failure to take advantage of available alternatives may render an aesthetic impact unduly adverse. See *id.* at 592, 572 A.2d at 920. Although the Board has not defined the term "generally available mitigating step," it has applied the term broadly. See *In re Denio*, 158 Vt. at 240-41, 608 A.2d at 1172-73 (imposition of mitigating conditions, including requirement to retain open spaces and limit agricultural and forestry use, was reasonable under circumstances); *In re Quechee Lakes*, 154 Vt. at 546, 549-50, 580 A.2d at 959, 961 (removal of installed skylights, construction of visual barriers and installation of nonglare glass were reasonable mitigating steps).

■ Based on the Board's prior applications, we do not think that an alternative must be formally recognized or widely available to be generally available. Instead, we think a generally available mitigating step is one that is reasonably feasible and does not frustrate the project's purpose or Act 250's goals. We note that in some circumstances mitigating steps may be unaffordable or ineffective. In those circumstances, it is within the Board's discretion to grant or deny a permit. 10 V.S.A. § 6086(c).

■ In this instance, we agree with the Board that neither the possibility of federal disapproval nor the novelty of the light shields renders the devices generally unavailable. Based on Stokes's representations to the Board, light shields have been manufactured, purchased and installed for use on at least one other tower. There was no suggestion that the shields posed a technological, logistical or financial impediment. Stokes's expert testified that with installed shields, the tower would comply with FAA regulations and likely receive FAA approval. The Board's conclusion that the light shields

were a generally available mitigating step is supported by the evidence.

*Affirmed.*