STATE OF VERMONT

ENVIRONMENT COURT

<table>
<tr><td></td><td>}</td><td></td></tr>
<tr><td>In re Rinkers, Inc., d/b/a</td><td>}</td><td></td></tr>
<tr><td>Rinkers[1] Communications, and</td><td>}</td><td>Docket No. 302-12-08 Vtec</td></tr>
<tr><td>Beverly and Wendell Shepard[2]</td><td>}</td><td></td></tr>
<tr><td>(Appeal of Shaw, <u>et al</u>.)</td><td>}</td><td></td></tr>
<tr><td></td><td>}</td><td></td></tr>
</table>

<u>Decision and Order</u>

Appellants Karen Shaw, Forrest Foster, Joe McCarthy, Jo-Anne McCarthy, Katherine Mitchell, and David Mitchell appealed from a decision of the District 7 Environmental Commission issuing Act 250 Land Use Permit No. 7C1219-2 to Appellee-Applicants Rinkers, Inc., d/b/a Rinkers Communications (Rinkers), as well as to landowners Beverly and Wendell Shepard, who have not entered an appearance in this appeal. Heather Bryant had been granted "friend of the commission" status by the District Commission and retained that status as <u>amicus</u> <u>curiae</u> in the present appeal. Rural Newco, LLC, d/b/a AT&T Mobility (AT&T) also was given leave to participate in this appeal as <u>amicus</u> <u>curiae</u>. Rinkers and AT&T may be referred to in this decision together as Appellee-Applicants or Applicants; the word Applicant used in the singular refers to Rinkers alone.

Appellants and Ms. Bryant are represented by Jared M. Margolis, Esq.; Appellee-Applicant Rinkers is represented by L. Brooke Dingledine, Esq.; AT&T is represented by William J. Dodge, Esq. and Charlotte B. Ancel, Esq. The Land Use Panel of the Natural Resources Board did not enter an appearance in this matter, but has

---

[1] Applicant's business name appears on its letterhead without the apostrophe.
[2] Previous decisions have misspelled Shephard; the spelling of Shepard is taken from a deed in evidence.

informational status through Melanie M. Kehne, Esq.; the Vermont Agency of Natural Resources did not enter an appearance in this matter, but has informational status through Judith Dillon, Esq.

The Court denied Appellee-Applicants' motion for partial summary judgment on the issue of whether Appellant's current appeal was barred under the doctrine of issue preclusion. In re Rinker's, Inc., No. 302-12-08 Vtec (Vt. Envtl. Ct. Aug. 19, 2009) (Wright, J.). The Court also denied Appellee-Applicants' motion to dismiss the appeal on the ground that Appellants lack party status as appellants under the aesthetics element of Act 250 Criterion 8.[3] In re Rinker's, Inc., No. 302-12-08 Vtec (Vt. Envtl. Ct. Sept. 17, 2009) (Wright, J.)

An evidentiary hearing was held in this matter over the course of four days before Merideth Wright, Environmental Judge. A site visit was also taken with the parties and their representatives. The parties were given the opportunity to submit written memoranda and requests for findings, and extended the time for these filings by agreement. Upon consideration of the evidence as illustrated by the site visit, and of the written memoranda and requests for findings filed by the parties, the Court finds and concludes as follows.

The Town of Hardwick is located in the Lamoille River valley at the junction of three principal through roads: Routes 14, 15, and 16. Route 15 runs in an east-west direction through the center of Hardwick following the course of the Lamoille river. Route 14 runs in a north-south direction. Coming from the south, Route 14 makes a T-intersection with Route 15 in the historic area near the center of Hardwick. Less than a

---

[3] The Court recognizes that the Appellants may have additional concerns about the proposed tower, including those regarding health and property values alluded to in the decision in the municipal appeal, In re Shaw, No. 4-1-05 Vtec, slip op. at 5 (Vt. Envtl. Ct. Oct. 2, 2006) (Durkin, J.), aff'd, 2008 VT 29, 183 Vt. 597; however, only the aesthetics element of Act 250 Criterion 8 is at issue in the present appeal. 10 V.S.A. § 6086(a)(8).

mile to the west along Route 15, Route 14 continues in a northerly direction towards Craftsbury. Approximately two miles to the east of the center of Hardwick along Route 15, Route 16 begins; it runs in a northeasterly direction towards Greensboro Bend. Two other secondary roads extend towards the north from the center of Hardwick, roughly parallel to Routes 14 and 16: Center Road and the old Bayley-Hazen military road, both ending at Greensboro/Caspian Lake.

Also leading to the north out of the village of Hardwick is a smaller roadway, Bridgman Hill Road, which runs in a north-south direction uphill from the village through a wooded residential area and past a large school complex. It opens out on the height of land into farmland with hedgerows and stands of trees. The Village forest and a number of large tracts of land protected by conservation easements are located to the west of Bridgman Hill Road, and a network of trails is maintained for public use in the area. Access to a town gravel pit leads to the west from Bridgman Hill Road. The area contains rural residential and agricultural properties, which are bordered by forested tracts of land. Several of the farms in the area follow organic practices. A farm silo is located near Bridgman Hill Road in the area of the proposed project. One of the farms in the area maintains a wind turbine on a 100-foot tower to provide a portion of its electric supply. The area represents a beautiful example of the traditional Vermont working agricultural and forest landscape interspersed with non-farm residences.

A revocable trust for the benefit of Wendell and Beverly Shepard owns a 222.17-acre parcel of property with a house, which has the address of 708 Bridgman Hill Road. The Shepard property is located on both sides of Bridgman Hill Road near the height of land but below the ridgeline of Bridgman Hill. The Shepard property contains several large fields, some wooded areas, and the Shepard residence. Much of the Shepard property, especially on the western side of the road is subject to conservation easements held by the Vermont Land Trust. The most northerly Shepard field (the North Shepard field) on the easterly side of the road is proposed for the telecommunications tower at

3

issue in this appeal. The North Shepard field is adjacent to Appellant Shaw's farm. The field slopes gradually to the south and east away from the Shaw property and away from Bridgman Hill Road. The project site is surrounded on its easterly, northerly, and westerly sides by a dense band of trees. The northerly portion of this dense band of trees, some on the Shepard property but most on the Shaw property, separates the North Shepard field visually from the Shaw property. Some of the trees that were over 60 feet in height in 2005 had grown to as much as approximately 85 feet in height as of the date of trial. The trees are anticipated to grow to a height of about 100 feet at maturity. The dense band of trees along Bridgman Hill Road on the Shepard property separates the tower location visually from Bridgman Hill Road. The Shepard field is hayed each year. The fact that the tower site is approximately 23 feet lower in elevation than the trees at the northerly property boundary has the effect of reducing the apparent height of the tower in relation to the height of the screening bands of trees when seen from Bridgman Hill Road north of the tower site or from other roads and properties farther to the north. At the present height of the trees, approximately the top 95 or 100 feet of the tower-and-antenna structure will be visible above the trees when viewed from the north or the west. The proposed tower would not affect views towards the west from the Bridgman Hill Road area.

An existing 43-foot wooden telecommunications pole or tower, and its associated antenna assembly and associated ground-mounted equipment, is located on a 200' x 200' portion of the Shepard field. This site has been used for telecommunications equipment for approximately twenty-five years. The existing pole had been installed by the Adephia Cable Company and was used by it for telecommunications equipment until Rinkers acquired it in 2003. Rinkers removed the existing satellite dish and parabolic antennas and installed its pager antennas on the pole; AT&T is also using the existing tower for its mobile telephone antennas. AT&T's predecessor (Unicel) obtained an earlier amendment of the tower's Act 250 permit to locate the preset antennas on the

4

tower and to increase the tower to its present height.

The property on which the tower is proposed is located in the Compact Residential zoning district near its boundary with the Rural Residential zoning district. The purpose of the Compact Residential zoning district "is to provide for moderate to high density residential development, and appropriate non-residential uses, in predominately built-up areas within and surrounding the town's traditional village centers." Hardwick Zoning and Subdivision Bylaws (Bylaws) § 2.4(A). Telecommunications facilities are allowed in the Compact Residential zoning district if approved as a conditional use; conditional use approval was granted to the proposed tower, on appeal, at the 180-foot height (plus the top antenna). Appeal of Shaw, No. 4-1-05 Vtec.

Applicant Rinkers is licensed by the Federal Communications Commission (FCC) as a radio common carrier. Applicant Rinkers has provided paging services to the general public for more than twenty-five years and advertises on its letterhead that it provides paging services "from Boston to Montreal." Its customers include many public safety and medical services providers. Applicant Rinkers maintains other telecommunications towers in Vermont, including one on Irish Mountain in Berlin that is similar in height, lattice design, guy-wire support, and antenna array to what is proposed in the present case. (Rinkers Ex. 40).

Applicant Rinkers has entered into a lease of a 440' x 400' portion of the Shepard field, together with an access easement over the Shepard property. Rinkers proposes to remove the existing tower and equipment shelter and to install a new tower and two new equipment buildings on the leased property. The lease runs for a term of twenty years with an option to renew for another ten. The land use surrounding the immediate project site will remain in its current agricultural use as a hay field; the land use of the project site itself will remain in its use for a telecommunications tower.

The proposed tower is 180 feet in height, exclusive of antennas to be mounted

5

upon it. The topmost antenna will bring it to just under 200 feet so that it is not required to be lighted. Due to its height, the tower location is proposed to be located two hundred feet from the property lines so that any failure of the tower structure would not fall beyond the property boundary. Because of this location requirement, the base of the tower will be located at an elevation that is 23 feet lower than the elevation at the property boundary.

The tower is proposed to be constructed of galvanized steel that weathers to a grey matte finish; the antennas can be finished in a similar color. The proposed tower is of an open lattice-type construction, as shown in schematic form in Rinkers Ex. 11, rather than a solid pole-type or so-called monopine construction. The tower is proposed to be 44 inches in width and, according to the schematic drawing, does not taper from base to top. The proposed tower is supported and stabilized by guy wires extending out from the tower to three anchor points on the ground from each of four levels on the tower.

The open lattice-type construction minimizes the visual obtrusiveness of the structure in the surrounding landscape, as it allows the viewer to see the background through the tower, as contrasted with the appearance of a solid structure such as a monopole or a monopine. The matte grey finish of the metal contributes to this effect, compared with the visibility of a more reflective surface or a brightly painted surface. Similarly, the guy wires are not noticeable against the background when viewed from the middle or far distance.

Applicant Rinkers proposes to place its 22-foot-long pager and two-way radio antennas at the 180-foot level for transmitting, and at the 100-foot level for receiving, leaving six levels, each separated vertically by ten feet, for other users. The pager antennas must be placed above the surrounding trees and must be separated vertically from each other to avoid interference. AT&T seeks to locate its wireless telephone antennas at a centerline level of 160 feet to achieve greater coverage in the Hardwick

6

area, including on Routes 14 and 15. The cellular antennas are attached to the tower on booms so that they can be tilted to provide the best signal, and they are attached on all sides of the tower at a given level to provide a 360° range of service out from the tower. Emergency services dispatching for the Town of Hardwick seeks to locate on the proposed tower, as does the Vermont Electric Power Company (VELCO). VELCO is involved in establishing a statewide communications network for personnel involved in maintenance of utility lines and emergency services during power outages. At least one other cellular telephone provider has also expressed interest in co-locating on the proposed tower, as has a provider of wireless internet broadband services.

Applicant proposes to construct two equipment buildings, each 12' x 30' in footprint, to be located directly to each side of the tower base.[4] The buildings' entrances will be lit by a down-cast, motion-activated light and will not cause light that is obtrusive or different from that produced by a residence or farm. The shorter ends of the buildings are proposed to be joined by chain link fencing to prevent unauthorized access to the space between the buildings and to the tower itself.

Electrical service to the equipment buildings is proposed to be placed underground, running from the nearest pole on the Shepard property carrying electrical service. The equipment buildings will be air conditioned; no evidence was presented suggesting that the air conditioners will create noise greater than or different from the noises to be expected from farm-based machinery or air conditioner noise.

A propane-powered electric generator is proposed to be installed in the area between the equipment buildings to provide back-up electricity in the event of a power outage. The generator is proposed to be is located at least 200 feet from the nearest

---

[4] The original application proposed buildings that were 12' x 24' in footprint; in the present application Applicant is seeking approval of the greater building length. As the buildings will not be visible, and the current proposal does not alter the noise or the lighting or any other aesthetic effects of the proposed project, this change in the proposal may be considered by the Court.

7

property line. It is proposed to be equipped with a sound-attenuating weatherproof enclosure so that the sound level at a distance of fifty feet from the source would be between 62 and 69dbA. Sound levels decrease as one moves farther from the source. The generator is proposed to be run for a half-hour test each week during daytime hours; otherwise it will only be in use during power outages to provide emergency power. Neither the generator nor the air conditioners will produce noise that is incompatible with or that does not fit the context of noise on working farms.

Due to the trees that screen the tower site, the existing tower and ground-mounted equipment or equipment shelter is not easily observed from nearby roads or residences. However, telecommunications technology depends on the existence of a line of sight for the telecommunications signal or radio waves to travel from one antenna to another. The height of the existing tower is insufficient to reach over the trees in order to achieve a reliable paging signal into the buildings in Hardwick, and it is insufficient to reach areas in the "shadow" of surrounding higher topography. It is insufficient to provide a reliable dispatching service for the police dispatcher to reach the appropriate police personnel throughout the town or for an officer making a traffic stop to stay in contact during the course of the stop. The height of the existing tower is insufficient to allow reliable personal wireless (cellular telephone) service throughout Hardwick or even on all the main roadways through Hardwick. To avoid dropped calls, an antenna must be located at an elevation that can "hand off" the signal to an antenna on the next tower in the direction that the customer is traveling. These deficiencies may have an effect on public safety in the case of communications between emergency workers and their respective police or fire dispatchers or hospital emergency rooms. The lack of reliable cell phone service also has adverse economic effects on existing businesses, and on businesses considering locating in the area. Given current societal expectations of being able to stay connected to cellular telephone and wireless internet services, even tourism can be affected if a tourist destination cannot

offer reliable telecommunications services.

The portion of the proposed tower above the trees will be visible as a distant view from various points in the village and along the roadways through town. To drivers and pedestrians moving along the village streets and town roadways, other than in the area of Bridgman Hill Road itself, the views of the tower will be brief in duration and not obtrusive in the visual landscape. Views of the distant tower from the commercial area of town will be unobtrusive when seen between nearer commercial elements such as gasoline station canopies and commercial signs.

To travelers going up Bridgman Hill Road from the south, the entire tower will be visible in the middle distance for a short period of time, as the mature trees do not block the tower location from the south, until the viewer reaches the point at which the lower portion of the tower is substantially screened by the mature trees close to the road. From that point, the northbound traveler would not have a view of the top half of the tower without looking up above the trees close to the roadway. To travelers southbound on Bridgman Hill Road, the top half of the tower will be visible above the trees but towards the side of the road and not in a prominent location with reference to the view. Instead, the tower will be seen in conjunction with a silo in the middle distance that to some extent distracts the eye.

However, for residents of the area of Bridgman Hill Road near the tower site, the tower will be visible from their homes and farms. Because of its size, it will be obtrusive to the nearby neighbors, even though the lower half of the tower will be screened by the trees and the tower will not intrude into their views towards the west.


Overview of Aesthetics Subcriterion

Criterion 8 of Act 250 requires that proposed projects "[w]ill not have an undue adverse effect on the scenic or natural beauty of the area, aesthetics, historic sites or rare and irreplaceable natural areas." 10 V.S.A. § 6086(a)(8). As discussed in its August 19,

2009 decision, the Court distinguished among the enumerated elements under Criterion 8, ruling that the only element at issue in the present case is whether the proposed project will or will not have an undue adverse effect on aesthetics. 10 V.S.A. § 6086(a)(8). As the Court noted in distinguishing between the "aesthetics" element of Criterion 8 and the separate Criterion 8 element regarding a project's effect on the "scenic or natural beauty" of the area, the category of "aesthetics is a broader and different category than scenic and natural beauty — depending on its surroundings, a project could have an adverse effect on aesthetics without having an adverse effect on scenic or natural beauty." In re Rinker's, Inc., No. 302-12-08 Vtec, slip op. at 6. The aesthetics inquiry focuses on whether the project will "be in harmony with its surroundings," In re Quechee Lakes Corp., Permit Nos. 3W0411-EB & 3W0439-EB, Findings of Fact, Concl. of Law, & Order, at 18 (Vt. Envtl. Bd. Nov. 4, 1985)[5]; that is, "whether it will 'fit' the context of the area where it will be located." Re: Susan Dollenmaier and Martha Dollenmaier Spoor, Permit #3W0125-5-EB, Findings of Fact, Concl. of Law, & Order, at 11 (Vt. Envtl. Bd. Feb. 7, 2005).

Burden of Proof on Aesthetics Subcriterion

In any Act 250 appeal, "the burden of proof that Act 250 imposes on each party will determine how [the Court] view[s] the evidence each party submits in regards to the Act 250 Criteria that have been properly preserved for our review." In re Eastview at Middlebury, Inc., No. 256-11-06 Vtec, slip op. at 3 (Vt. Envtl. Ct. Feb. 15, 2008), aff'd, 2009 VT 98. The burden of proof that a party must satisfy includes both "the burden of production and the burden of persuasion." Id. at 4. The "burden of production requires the obligated party to produce sufficient evidence for a district commission, or

---

[5] Under 10 V.S.A. § 8504(m), the Court is directed to give "the same weight and consideration" to prior decisions of the former Environmental Board as it gives it its own prior decisions.

10

this Court on appeal, to make a factual determination; the burden of persuasion refers to the obligation of persuading the fact finder that certain facts are more likely true than not." Id. (citing In re Denio, 158 Vt. 230, 237–39 (1992)). Under Act 250, "regardless of who has the burden of proof on a particular [criterion], the applicant always has the burden of producing evidence sufficient to enable the Board [or this Court] to make the requisite positive findings on all of the criteria." Re: Susan Dollenmaier, Permit #3W0125-5-EB, at 8; see also In re Eastview, No. 256-11-06 Vtec, slip op. at 5 (stating that "an applicant always carries the initial burden of producing some evidence that would allow for positive findings upon each of the applicable Act 250 Criteria"). "Either party's burden, however, may be satisfied by evidence introduced by any of the parties or witnesses . . . ." In re McShinsky, 153 Vt. 586, 589 (1990) (quoting In re Quechee Lakes Corp., 154 Vt. 543, 553–54 (1990)).

The burden of proof, in the sense of the burden of persuasion (rather than in the sense of the initial burden of production of evidence), is established in 10 V.S.A. § 6088. With respect to aesthetics under Criterion 8, the burden of persuasion is "on any party opposing the applicant . . . to show an unreasonable or adverse effect." Denio, 158 Vt. at 236 (quoting 10 V.S.A. § 6088(b)). That is, it is Appellants who bear the risk of nonpersuasion as to the aesthetics subcriterion. Id. at 237.

Application of Aesthetics Subcriterion—the Quechee Lakes Test

Act 250 Criterion 8 "was intended to ensure that as development occurs, reasonable consideration will be given to the visual impacts on neighboring landowners, the local community, and on the special scenic resources of Vermont." Re: Barre Granite Quarries, LLC, Permit No. 7C1079-EB, Findings of Fact, Concl. of Law, & Order, at 78 (Vt. Envtl. Bd. Dec. 8, 2000) (citing Horizon Dev. Corp., Permit No. 4C0841-EB, Findings of Fact, Concl. of Law, & Order, at 20 (Vt. Envtl. Bd. Aug. 21, 1992)). Criterion 8 "was not intended to prevent all change to the landscape of Vermont or to

guarantee that the view a person sees from his or her property will remain the same forever." Re: John Larkin, Inc., Permit No. 4C0526-11R(2)-EB, Findings of Fact, Concl. of Law, & Order, at 9 (Vt. Envtl. Bd. Oct. 11, 2005) (quoting Re: Okemo Mountain Inc., Permit No. 2W5051-8-EB, Findings of Fact, Concl. of Law, & Order, at 9 (Vt. Envtl. Bd. Dec. 18, 1986)). The Environmental Board cases applying Criterion 8 recognize that "change must and will come," and that the Act 250 aesthetics analysis "will not be an impediment" to that change. Id.

In undertaking an aesthetics analysis under Criterion 8, the Court applies what is commonly known as the Quechee Lakes test. See Quechee Lakes, Permit Nos. 3W0411-EB & 3W0439-EB, at 19. First, the Court must determine "whether the project will have an adverse effect under Criterion 8." Re: Susan Dollenmaier, Permit #3W0125-5-EB, at 10 (citations omitted). If the Court finds that the proposed project will have an adverse effect, then it moves on to the second part of the Quechee Lakes test, which requires the Court to determine whether the adverse effect of the project will be "undue," using a three-part analysis. Quechee Lakes, Permit Nos. 3W0411-EB & 3W0439-EB, at 19; Re: Susan Dollenmaier, Permit #3W0125-5-EB, at 11.

Whether the proposed project will have an "adverse' effect on aesthetics

In analyzing a project's effects on aesthetics, as distinct from its effects on scenic beauty, the Court must initially determine the context of the proposed project, and then it must analyze the effect of the proposed project on its surroundings or context, in order to determine whether the effect will be adverse. See Quechee Lakes, Permit Nos. 3W0411-EB & 3W0439-EB, at 19; Re: Susan Dollenmaier, Permit #3W0125-5-EB, at 11. More specifically, the Court

> looks to whether a proposed project will be in harmony with its surroundings or, in other words, whether it will "fit" the context within which it will be located. In making this evaluation, the Board examines a number of specific factors, including the nature of the project's

12

surroundings, the compatibility of the project's design with those surroundings, the suitability for the project's context of the colors and materials selected for the project, the locations from which the project can be viewed, and the potential impact of the project on open space.

Re: Susan Dollenmaier, Permit #3W0125-5-EB, at 11 (citations omitted).

After undertaking this analysis, if the Court "concludes that the Project has no adverse aesthetic impacts on its context, then it fits that context and the Project satisfies Criterion 8," which ends the analysis. Id. at 12 (citing Re: John J. Flynn Estate & Keystone Dev. Corp., Permit No. 4C0790-2-EB, Findings of Fact, Concl. of Law, & Order, at 20 (Vt. Envtl. Bd. May 4, 2004)). On the other hand, if the Court concludes that the Project has an adverse effect under Criterion 8, the Board moves to the second part of the test and evaluates whether the adverse effect is "undue." Id. at 11.

In Quechee Lakes, the context or surroundings was the human-influenced river valley landscape of the Quechee valley. Quechee Lakes, Permit Nos. 3W0411-EB & 3W0439-EB, at 4–5, 20–21. The context of a project, for determining its aesthetic effect, may instead relate to the built environment or to some other aspect of the surrounding area, rather than only to an area's "scenic" or "natural" beauty. See, e.g., Re: Brewster River Land Co., LLC., Permit #5L1348-EB, Findings of Facts, Concl. of Law, & Order, at 13–16 (Vt. Envtl. Bd. Feb. 22, 2001) (concluding that a project would have an adverse effect, although not an undue one, on aesthetics because the size and density of the proposed units would differ from that of the surrounding structures); Re: Talon Hill Gun Club, Inc. & John Swinington, Permit No. 9A0192-2-EB, Findings of Fact, Concl. of Law, & Order, at 1 (Vt. Envtl. Bd. June 7, 1995) (concluding that the project would have an adverse effect, although not an undue one, on aesthetics because the level of noise generated by the project would not "fit" into the surroundings in which that noise was generated.)

In the present case, the context of the proposed project is an area that marks a transition between the more compact residential and mixed uses in the Village and the

13

river valley, and the traditional agricultural, forest, and conservation uses at the higher elevation to the north. It is located at the upper edge of the Compact Residential zoning district. The beautiful traditional open working farm landscape on the height of land above the project area also includes vertical structures expected in a working rural landscape, including silos and at least one wind turbine on a 100-foot supporting tower, and the equipment, noises, and functions of working farms. Many of the fields are surrounded by hedgerows or lines of trees, and the open farm fields adjoining Bridgman Hill Road are adjoined by more dense tracts of forested land and woodlots to their east and west.

The area of the project also represents a transition between the Hardwick recreational trails system in the Village forest and on conserved lands to the west of Bridgman Hill Road and the more open agricultural uses to the east of Bridgman Hill Road. Bridgman Hill Road also provides access to a large school complex, lower down on the road than the proposed site, and a municipal gravel pit to the west of the proposed project site. The land use surrounding the immediate project site will remain in its current agricultural use as a hay field; the land use of the project site itself will remain in its use for a telecommunications tower.

The proposed tower is not a wholly unexpected or discordant element in the visual field when viewed from a distance, from the Village area, or in the short-term glimpses from which it could be seen from the major roadways through town. However, due to the approximately at least 80 feet of the tower and antenna assembly that will be visible above the height of the trees even at maturity, it will have an adverse effect on the aesthetics of the area when viewed from the north, looking south on Bridgman Hill Road, when viewed from some of the neighbors' properties, and when viewed in the middle distance coming up the road from the south. That is, the proposed tower will not "fit" its context, and therefore will have an adverse effect on the aesthetics of the area.

14

<u>Whether the proposed project will have an undue adverse effect on aesthetics</u>

As the proposed project will have some adverse effect on aesthetics, the second step in the <u>Quechee Lakes</u> analysis requires the Court to determine whether that adverse effect is "undue." <u>Quechee Lakes</u>, Permit Nos. 3W0411-EB & 3W0439-EB, at 19. An adverse effect is considered "undue" if the Court answers any one of the following three questions in the affirmative: "(1) does the project violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; (2) does the project offend the sensibilities of the average person; and (3) has the applicant failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." <u>In re: Appeal of Times & Seasons, LLC and Benoit</u>, 2008 VT 7, ¶ 8 (citing <u>In re McShinsky</u>, 153 Vt. at 592 ).

<u>Whether the project violates a clear, written community standard intended to preserve the aesthetics of the area</u>

In determining whether a project violates a clear, written community standard, the Court "routinely looks to town plans, open land studies, and other municipal documents to discern whether a clear, written community standard exists and should be applied in the review of the aesthetic impacts of a project." <u>Re: Times & Seasons, LLC</u>, Permit No. 3W0839-2-EB, Findings of Fact, Concl. of Law, & Order (Altered), at 42 (Vt. Envtl. Bd. Nov. 4, 2005), <u>aff'd in part and rev'd in part on other grounds</u>, 2008 VT 7.

The Hardwick Town Plan (Town Plan) specifically identifies three aesthetic or scenic resources to be protected: Buffalo Mountain, which also appears on the Town seal, the Lamoille River, and Mackville Pond. Bridgman Hill is not specifically

identified for protection in the Town Plan.[6]  Nor does the existence of the Hardwick Trails system provide a clear, written community standard intended to preserve the aesthetics of the area; the evidence does not disclose any written standard that regulates the views visible from the trails system.  In any event, the proposed tower will be visible only from a small segment of a trail and only for a short time by persons moving along that trail.

Even though a town plan does not specifically identify a resource to be protected, it is nevertheless possible for a town plan to provide a clear, written community standard by identifying a class of resources or features to be given a specific level of protection or preservation, as long as the plan is sufficiently specific.  In re JAM Golf, LLC, 2008 VT 110, ¶ 17, 185 Vt. 201. However, the Hardwick Town Plan also does not specifically identify a type of landscape feature to be given any specific level of protection.  Nor does it provide a clear, written community standard governing telecommunications towers that would preclude a tower from being approved for this location.  Rather, like the Zoning Regulations, the Town Plan states a policy balancing the Town's need for modern telecommunications facilities and the inherent intrusiveness of towers in the landscape by promoting co-location and allowing taller tower structures to achieve co-location.  Town Plan at 28–30.  The Town Plan favors maintaining the present patterns of land use, Town Plan at 12, and "encourage[s] the preservation of the scenic natural skyline," Town Plan at 14, but it does not identify a specific level of protection that would be violated by the proposed tower.

---

[6]  The fact that the Town Plan and the Zoning Bylaws express a preference for "minimiz[ing]  tower and antenna proliferation by encouraging the sharing of existing communications facilities, towers and sites where possible and appropriate," Town Plan at 29, that is, for co-location, does not affect the analysis of whether there are any clear, written community standards about the aesthetics of the Bridgman Hill area. That policy may be relevant to the analysis of available mitigating steps, particularly in considering tower height.

16

Similarly, the Northeastern Vermont Development Association Regional Plan for the Northeast Kingdom (Regional Plan) does not specifically identify the Bridgman Hill area as an area to be protected. Nor does it provide a clear, written community standard that would prohibit the tower at the height approved under the Town's zoning bylaws in the proposed location.[7]

The evidence therefore does not reflect any "clear, written community standard intended to preserve the aesthetics of the area" that would be violated by the proposed project.

Whether the project offends the sensibilities of the average person

The second factor of the aesthetics analysis requires the Court to determine whether the proposed project offends the sensibilities of the average person. Appeal of Times & Seasons, 2008 VT 7, ¶ 8. This inquiry "includes whether the Project would be so out of character with its surroundings or so significantly diminish the scenic qualities of the area as to be offensive or shocking to the average person." Re: Times & Seasons, Permit No. 3W0839-2-EB, at 49. See, e.g., In re Rivers Dev. Conditional Use Appeal, Nos. 7-1-05 Vtec & 68-3-07 Vtec, slip op. at 52 (Vt. Envtl. Ct. Mar. 25, 2010) (Durkin, J.) ("If our sensibilities are, collectively, offended by a project, its impact is undue." (quoting Quechee Lakes, Permit Nos. 3W0411-EB & 3W0439-EB, at 19)).

The aesthetic effect of a project may fall more heavily on some neighboring property owners than on the general public, for example, as experienced by the four

---

[7] Applicants argue essentially that the Regional Plan's promotion of improved wireless telephone coverage on the numbered state highways in the region, and improved availability of high-speed internet broadband, Regional Plan at 49, 52, should instead be considered as a clear, written community standard in favor of the proposed tower. However, within the context of the three-part Quechee Lakes analysis, the Court's inquiry is limited to whether there is a clear, written community standard intended to preserve the aesthetics of the area, and, if so, whether the proposal violates such a standard.

neighbors primarily affected by the ski bridge denied under this standard in <u>Okemo Mountain</u>, Permit No. 2S0351-8-EB, at 9. Nevertheless, the focus of the aesthetics analysis is not "in contemplation of protecting private property; rather, Criterion 8 serves as a mechanism for protecting members of the public from exposure to aesthetic degradation." <u>Re: Lawrence E. Thomas</u>, Permit No. #2W0644-EB, Findings of Fact, Concl. of Law, & Order, at 11 (Vt. Envtl. Bd. Feb. 18, 1986).

Appellants' tower simulations may be exaggerated somewhat in width depending on whether the blue balloon used for the balloon flight was four or six feet in diameter, as the tower width is eight inches narrower than four feet. The simulations are also slightly exaggerated in height by an amount equal to the diameter of the balloon, as evidence was presented that it was the balloon's string, that is, the bottom of the balloon rather than its top, that was set at 180 feet.[8] Despite these discrepancies, Appellants' simulated photographs were helpful in envisioning the potential appearance and visibility of the tower from various locations, especially as Applicants did not provide any alternative simulated photographs of the tower in the landscape, although they did provide photographs of a different (pink) test balloon's flight from various other locations. As the pink test balloon appeared to be larger in diameter than the blue one, it is most likely that it was the blue test balloon that was inflated to four feet in diameter.

Testimony of various witnesses differed sincerely as to whether the appearance of the tower was shocking or offensive to them personally. Although the Court

---

[8] Applicants argued that the tower simulation shown in Appellants' Ex. 4.1 was flawed because it did not account for the decrease in elevation to the location of the tower's base behind the trees shown in the photograph or the distance from the trees to that location. As the balloon was flying from the correct location of the tower's base, this flaw did not affect the rendition of the tower's height in the simulation, although it may have exaggerated the width of the tower and the size of the antennas if the actual location of the tower's base was more distant than assumed in the simulation.

recognizes the desire of especially the most nearby neighbors not to have such a tall man-made structure located near their homes, even based on Appellants' tower simulations and the totality of the evidence, Appellants have not established that the proposed tower is shocking and offensive to the average person.

<u>Whether the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings</u>

The third factor of the aesthetics analysis requires the Court to determine whether Applicants have "failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." <u>In re Times & Seasons</u>, 2008 VT 7, ¶ 8. If a project does have an adverse aesthetic effect, the applicant must "take generally available mitigating steps to reduce the negative aesthetic impact of a particular project," otherwise, "[f]ailure to take advantage of available alternatives may render an aesthetic impact unduly adverse." <u>In re Stokes Commc'ns Corp.</u>, 164 Vt. 30, 39 (1995) (citing <u>McShinsky</u>, 153 Vt. at 591–92). Although the Board has not defined the term "generally available mitigating step," it has applied the term broadly. <u>Id</u>. (citing <u>In re Denio</u>, 158 Vt. at 240–41; <u>Quechee Lakes</u>, 154 Vt. at 546, 549–50). In general, "a generally available mitigating step is one that is reasonably feasible and does not frustrate [either] the project's purpose or Act 250's goals." <u>Id</u>.

With respect to telecommunications towers, mitigating steps can include at least a tower's design, materials, and appearance; a tower's location within the project property with respect to landscape features and screening; a tower's height; and whether alternative locations for the tower have been considered.

<u>Design, materials, and appearance</u>

Applicants have taken generally available mitigating steps regarding the design,

materials, and appearance of the tower to improve the harmony of the proposed tower with its surroundings. The openwork lattice design enables the viewer to see the background through the tower, which minimizes how obtrusive the structure appears compared to a solid structure such as a monopole or a monopine. The matte grey finish of the metal also minimizes how obtrusive the lattice structure appears, compared to a more reflective surface or a brighter color, as does the fact that the tower will not be lit.

Location within the project property

Similarly, within the project property itself, Applicants have taken generally available mitigating steps to locate the tower to improve its harmony with its surroundings. It is in a location below the height of land, and a further 23 feet lower in elevation than the property boundary, so that less of the tower will appear to protrude above the ridgeline when viewed from the valley and village below. It is in a location surrounded on three sides by mature trees, which screen approximately the lower half of the tower from view. It is located to the side of an open scenic view, and it does not impair scenic views towards the west. It will not be noticeable from the Hardwick Trails system except for a relatively short segment of trail located on a conserved parcel of the Shepard's land. In addition, to the viewer traveling south on Bridgman Hill Road, a grouping of farm buildings, including a vertical silo, will break up the visual field to make the tower less obtrusive when seen from the north.

Height

Applicants have not taken mitigating steps to reduce the height of the proposed tower from the maximum height permitted by the municipal regulations and granted in the municipal permit. However, Applicants have shown that reducing the height of the tower would frustrate both the project's purpose of providing coverage in all directions and the Town Plan's preference for co-location of such services rather than the proliferation of towers.

Applicant Rinkers plans to use both the 180-foot level (for transmitting) and the 100-foot level (for receiving) for the pager and two-way radio business, leaving six levels, each separated vertically by ten feet, for other users. AT&T plans to use all three sides of the tower at a centerline level of 160 feet for its cellular phone services. Emergency services dispatching for the Town of Hardwick and the VELCO statewide communications network for utility personnel plan to locate on the tower. At least one other cellular telephone provider has also expressed interest in co-locating on the proposed tower, as has a provider of wireless internet broadband services.

Based on the community policy for improving coverage for economic development, including tourism, and for public safety, and the community policy for co-location of wireless telecommunication facilities, reducing the proposed tower's height is not an alternative that is reasonably available in the present case.

Alternative locations

Applicants for telecommunications facilities must prepare and submit specific signal propagation studies providing information on the coverage area for the facility and, for personal wireless service facilities, showing the adjoining cell sites owned or controlled by the applicant and how the project would link to those sites. The signal propagation studies for the proposed project were provided both for the Rinkers' paging service and for AT&T cell phone (personal wireless) service. In addition, the Town had commissioned a study (the Hutchins study, in evidence as AT&T Ex. II) to examine potential locations for telecommunications facilities to serve the Town.

It is important to recognize that, in the context of the aesthetics subcriterion of Act 250, an examination of alternative locations for a telecommunications tower is only relevant to determining whether Applicants have taken the generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. Act 250 is not, in general, a site selection statute, as contrasted with certain other state and federal statutory schemes under

21

which alternatives to a proposed project must be identified and analyzed by the project proponent, and must be compared to the proposal by the reviewing body.[9]  That is, unless specifically provided in a subcriterion of Act 250, the statute does not provide for the District Commission or this Court to determine if an applicant has selected the best place for a project among alternative proposals.[10]

With respect to aesthetics, in 1984, prior to developing the Quechee Lakes analysis, the former Environmental Board analyzed at length the issue of whether the Act 250 permitting process provided for it to evaluate alternative sites to determine whether such sites might result in effects on aesthetics that would be less adverse than those created by the proposed project:

> [W]e are constrained by the statute to conclude that we have no authority to entertain debate concerning the existence of alternate sites. The [District] Commissions and this Board on appeal have the authority to impose reasonable permit conditions to assure a project's conformance

---

[9]   An example of a federal statute requiring project proponents to identify and analyze alternatives to a proposed action is the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–75 (1970).  Under NEPA and its implementing regulations, 40 C.F.R. pts. 1500–08 (2009), an Environmental Impact Statement (EIS) is required for every proposed "major Federal action[] significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4.  Among other things, every EIS must "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed federal action.  40 C.F.R. § 1502.14(a).  This analysis of alternatives to the proposed action is at "the heart of the [EIS]," id. § 1502.14, and requires the federal agency proposing the project to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  Id.

[10] Certain other criteria in Act 250 require that a permit be denied if an alternative location exists to one that will create significant harm.  See e.g., 10 V.S.A. § 6086(a)(8)(A)(iii) ("A permit will not be granted if it is demonstrated by any party opposing the applicant that a development or subdivision will destroy or significantly imperil necessary wildlife habitat or any endangered species; and a reasonably acceptable alternative site is owned or controlled by the applicant which would allow the development or subdivision to fulfill its intended purpose.")

22

with the ten criteria. See 10 V.S.A. § 6086(c). Pursuant to this authority, we may inquire concerning feasible alterations to the project design. . . . [W]here we find that a project will have adverse aesthetic consequences, conditions should be imposed in an attempt to eliminate those adverse effects which are unreasonable or unnecessary.

. . . .

However, we do not find . . . in Act 250, authority to investigate alternative sites in respect to matters of aesthetics. The Legislature has, in specific instances, required us to evaluate alternatives (see 10 V.S.A. § 6086(a)(1)(F)—Shorelines, (8)(a)(iii)—necessary wildlife habitat and endangered species, (9)(B)(iii) and (9)(C)(iii)—primary agricultural, secondary agricultural and forest soils). The Legislature has not given us such discretion in respect to matters of aesthetics.

Therefore, our options are limited to imposing reasonable conditions . . . or denial of an application where undue adverse aesthetic impacts cannot be corrected by imposition of conditions . . . .

Re: Vermont Electric Power Company, Inc., Permit #7C0565-EB, Findings of Fact, Concl. of Law, & Order, at 4–5 (Vt. Envtl. Bd. Dec. 12, 1984). Thus, in the aesthetics analysis under Criterion 8 of Act 250, the potential for alternatives to the proposal only relates to determining whether the applicant has taken reasonable mitigating steps to improve the project's harmony with its surroundings.

In the present case, Applicants' and the Town's analyses both concluded that a site on Buffalo Mountain itself would be the only potential alternative from a coverage point of view. Such a site would require trees to be cleared to develop an access road to the site. Because the Town Plan recognizes Buffalo Mountain as specifically deserving of protection as a scenic resource, a Buffalo Mountain location that would achieve a similar level of coverage would frustrate the purposes of Act 250. A Buffalo Mountain location therefore also would not be a reasonable mitigating step. Unlike the applicants in Re: The Mirkwood Group, No. 1R0780-EB, Findings of Fact, Conclusions of Law, and Order, § VI(E)(2)(c) (Vt. Envtl. Bd. Aug. 19, 1996), Applicants did examine the available alternative location, which is not an available mitigating step in the present case.

Accordingly, Appellants have failed to carry their burden of proof to show that the proposed project will have an undue adverse effect on aesthetics; therefore, the project meets the aesthetics element of Criterion 8 of Act 250. As the issue of aesthetics was the only issue on appeal, the permit as granted by the District Commission must be approved.

Effect of Federal Telecommunications Act of 1996

Applicants also argue that the federal Telecommunications Act of 1996, 24 U.S.C. § 332, should be applied in favor of approving the proposed project. This federal law preserves but limits the ability of state and local authorities to regulate telecommunications services, including towers. The federal Telecommunications Act was intended "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." In re: Appeals of Rathburn, Nos. 130-8-01 Vtec & 149-9-01 Vtec, slip op. at 4 (Vt. Envtl. Ct. Feb. 12, 2002) (Wright, J.) (quoting 360° Commc'ns Co. of Charlottesville v. Bd. of Supervisors of Albemarle County, 211 F.3d 79, 85–86 (4th Cir. 2000)). The Telecommunications Act "preserves local and state authority, such as the zoning authority in the present case, over decisions regarding the placement, construction, and modification of personal [wireless] services." In re: Appeals of Vermont RSA Ltd. P'ship 1, d/b/a Bell Atlantic NYNEX Mobile (BANM), Nos. E96-192 & E96-205, slip op. at 2 (Vt. Envtl. Ct. July 18, 1997) (Wright, J.). See also 47 U.S.C. § 332(c)(7)(A) ("[N]othing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities"); In re New Cingular Wireless, d/b/a AT&T Sousa Telecommc'ns Permit, No. 162-7-08 Vtec, slip op.

at 10, n.12 (Dec. 30, 2009) (Durkin, J.) (The Act "govern[s] the authority of a local government over decisions regarding the placement, construction, and modification of personal wireless service facilities"). The federal Act does limit state and local authority in two respects: state or local regulations may not discriminate among providers of telecommunications services, and state and local regulations governing telecommunication services are precluded from "prohibit[ing] or hav[ing] the effect of prohibiting the provision of personal wireless services." Id. § 332(c)(7)(B)(i)(I), (II). However, as the project qualifies for approval under the aesthetics criterion of Act 250 without considering federal preemption, it is not necessary to determine whether its denial would have had this type of impermissible prohibitive effect.

Accordingly, based on the foregoing, it is hereby ORDERED and ADJUDGED that the proposed project will not have an undue adverse effect on aesthetics, and therefore Act 250 Land Use Permit No. 7C1219-2 is hereby GRANTED, affirming Act 250 Land Use Permit No. 7C1219-2 as granted by the District Commission. These proceedings are hereby remanded to the District 7 Environmental Commission, solely for the purpose of completing the ministerial act of issuing Act 250 Land Use Permit No. 7C1219-2, incorporating all elements of the District Commission decision that were not appealed, in a form consistent with this decision as to the aesthetics criterion.

Done at Berlin, Vermont, this 17th day of May, 2010.

_____

Merideth Wright
Environmental Judge